# Exhibit 2

**LEASE AGREEMENT**

between

DOF IV MEIDINGER TOWER, LLC, as Landlord

and

COMPUTERSHARE, INC., as Tenant

**MEIDINGER TOWER**

Dated:  November 5, 2014

**LEASE AGREEMENT**

THIS LEASE AGREEMENT (this "Lease") is entered as of November 5, 2014 (the "Effective Date"), between DOF IV MEIDINGER TOWER, LLC ("Landlord") and COMPUTERSHARE, INC. ("Tenant") for the demised premises described in this Lease in the Building known as Meidinger Tower and located at 462 S. 4th Street, Louisville, Kentucky 40202.

1.    **DEFINITIONS.**  The definitions of certain of the capitalized terms used in this Lease are set forth in the Glossary of Defined Terms attached as Exhibit A.

2.    **PREMISES.**  Subject to the provisions of this Lease, Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord: (i) approximately 27,960 rentable square feet ("RSF") which space is designated as Suites 1000 and 1100 (the "10th and 11th Floors"); and (ii) approximately 13,980 RSF which space is designated as Suite 900 (the "9th Floor").  The aforereferenced demised space is outlined on the floor plans attached hereto as Exhibit B and collectively referred to herein as the "Premises".  In connection with such demise, Landlord hereby grants to Tenant the non-exclusive right to use during the Term all Common Areas designed for the use of all tenants in the Building, in common with all tenants in the Building and their invitees, for the purposes for which designed and in accordance with all Legal Requirements.  By occupying the Premises, Tenant accepts the Premises as being suitable for Tenant's intended use of the Premises subject to latent defects and seasonal variations.

3.    **TERM.**  The Term of this Lease shall be as follows: (i) with respect to the 10th and 11th Floors, the Term shall commence on April 1, 2015, and shall expire at 5:00 p.m. on July 31, 2020 unless earlier terminated as provided herein; and (ii) with respect to the 9th Floor, the Term shall commence on April 1, 2016, and shall expire at 5:00 p.m. on July 31, 2020 unless earlier terminated as provided herein.

4.    **USE.**  Tenant shall occupy and use the Premises solely for lawful, general business office purposes including a conference center, printing center, seminar rooms, call center and all other uses ancillary thereto in strict compliance with the Building Rules and Regulations from time to time in effect and all other Legal Requirements.

5.    **RENT.**

5.1    **Base Rent.**  In consideration of Landlord's leasing the Premises to Tenant, Tenant shall pay to Landlord as follows:

| Time Period | 10th and 11th Floors Monthly Amount | Time Period | 9th Floor Monthly Amount |
|---|---|---|---|
| Commencement Date - 3/31/2016 | $0.00 | Commencement Date - 9/30/2016 | $0.00 |
| 4/1/2016 – 3/31/2017 | $15,923.22 | 10/1/2016 – 3/31/2017 | $7,961.61 |
| 4/1/2017 – 3/31/2018 | $16,241.68 | 4/1/2017 – 3/31/2018 | $8,120.84 |
| 4/1/2018 – 3/31/2019 | $16,566.52 | 4/1/2018 – 3/31/2019 | $8,283.26 |
| 4/1/2019 – 3/31/2020 | $16,897.85 | 4/1/2019 – 3/31/2020 | $8,448.93 |
| 4/1/2020 – 7/31/2020 | $17,235.80 | 4/1/2020 – 7/31/2020 | $8,617.90 |

        The Base Rent set forth in this Section 5.1 is net of Operating Expenses and is a negotiated figure and shall govern whether or not the actual gross rentable square footage of the Premises is the same as set forth in Section 2 hereof or changes pursuant to the standards set in the definition of Net Rentable Area.  Tenant shall have no right to withhold, deduct or offset any amount of the monthly Base Rent or any other sum due hereunder even if the actual gross rentable square footage of the Premises is less than that set forth in Section 2 hereof or changes pursuant to the standards set forth in the definition of Net Rentable Area.

        5.2    **Additional Rent.**  For purposes of this Lease, Tenant's "Additional Rent" for any Fiscal Year (or portion thereof) shall mean the product of (a) Tenant's Share multiplied by (b) the amount of Operating Expenses, all as applicable for the period in question.  By the Commencement Date, Landlord shall estimate the Additional Rent to be due by Tenant for the balance of the Fiscal Year in which the Commencement Date occurs.  Thereafter, unless Landlord delivers to Tenant a revision of the estimated Additional Rent, Tenant shall pay to Landlord, coincident with Tenant's payment of Base Rent, an amount equal to the estimated Additional Rent for the remainder of such year divided by the number of months remaining in such year.  From time to time during any Fiscal Year, Landlord may estimate and, not more frequently that once annually, re-estimate the Additional Rent to be due by Tenant for that Fiscal Year and deliver a copy of the estimate or re-estimate to Tenant.  Thereafter, the monthly installments of Additional Rent payable by Tenant shall be appropriately adjusted in accordance with the estimation so that, by the end of the Fiscal Year, Tenant shall have paid all of the Additional Rent as estimated by Landlord.  Within one-hundred twenty (120) days following the conclusion of each Fiscal Year during the Term, and after the termination or expiration of the Term, Landlord shall deliver to Tenant a statement of actual Additional Rent due by Tenant for the Fiscal Year (or, with respect to termination or expiration, the portion of the Fiscal Year) just ended. Within 30 days thereafter, Tenant shall pay to Landlord or Landlord shall credit against the next installment of Additional Rent due by Tenant (or Landlord shall refund to Tenant, if the Term has expired and all payments due by Tenant to Landlord have been paid in full) the difference between the actual Additional Rent due for such year and the estimated Additional Rent paid by Tenant during such year.  Tenant may audit, at Tenant's expense and after giving 20-days' prior written notice to Landlord, Landlord's records relating to

2

Operating Expenses for any periods within two Fiscal Years prior to such audit; provided, however, no audit shall extend to periods of time preceding the Fiscal Year in which the Commencement Date occurs. If Tenant's audit shows an overpayment of Operating Expenses by Tenant, Landlord agrees to pay for Tenant's reasonable out of pocket costs actually incurred and associated with the performance of such audit.  Additional Rent will abate for the same periods as Base Rent.

5.3    **Payment of Rent.**  Except as otherwise expressly provided in this Lease, all Rent shall be due in advance monthly installments on the first day of each calendar month during the Term.  Rent shall be paid to Landlord at its address recited in Section 27.7 or to such other person or at such other address as Landlord may from time to time designate in writing. Rent shall be paid without notice, demand, abatement, deduction or offset in legal tender of the United States of America.  If the Term commences or ends on other than the first or the last day of a calendar month, the Rent for the partial month shall be prorated on the basis of the number of days during the month for which the Term was in effect.  If the Term commences or ends on other than the first or the last day of a Fiscal Year, the Additional Rent for the partial Fiscal Year shall be prorated on the basis of the number of days during the Fiscal Year for which the Term was in effect.

5.4    **Delinquent Payments and Handling Charge.**  All Rent and other payments required of Tenant hereunder shall bear interest from the date due until the date paid at the rate of interest specified in Section 27.13.  If such Rent is not paid within five (5) days from the due date, Landlord may charge Tenant, as additional Rent hereunder, a fee equal to five percent (5%) of the delinquent payment to reimburse Landlord for its cost and inconvenience incurred as a consequence of Tenant's delinquency.  In no event, however, shall the charges permitted under this Section 5.4 or elsewhere in this Lease, to the extent the same are considered to be interest under applicable law, exceed the maximum rate of interest allowable under applicable law.

6.    **CONSTRUCTION OF IMPROVEMENTS.**

6.1    **General.**  Subject to events of Force Majeure, Landlord shall install, furnish, perform and apply, at its expense, the Landlord's Work as specified in the Work Letter.  Performance of the Landlord's Work shall constitute Landlord's sole construction obligation to Tenant under this Lease.

6.2    **Access by Tenant Prior to Commencement of Term.**  Provided that Tenant obtains and delivers to Landlord the certificates or policies of insurance called for in Section 17.1, Landlord, in its sole discretion, may permit Tenant and its employees, agents, contractors and suppliers to enter the Premises before the Commencement Date (and such entry, alone, shall not constitute Tenant's taking possession of the Premises for the purpose of Section 6.3(c)) to prepare the Premises for Tenant's occupancy.  Tenant and each other person or firm who or which enters the Premises before the Commencement Date shall conduct itself so as to not interfere with Landlord or other occupants of the Building.  Landlord may withdraw any permission granted under this Section 6.2 upon 24-hours' notice to Tenant if Landlord, in its sole discretion, determines that any such interference has been or may be caused.  Any prior entry shall be under all of the terms of this Lease (other than the obligation to pay Base Rent and Additional Rent) and at Tenant's sole risk.  Landlord shall not be liable in any way for personal injury, death or property damage (including damage to any personal property which Tenant may bring into, or any work which Tenant may perform in, the Premises) which may occur in or about the Complex by Tenant or such other person or firm as a result of any prior entry.  Tenant will be permitted advance entry to the Premises in accordance with Section 28.1 herein.

6.3    **Commencement Date; Adjustments to Commencement Date.**  For purposes of this Lease, with respect to the Term of 10th and 11th Floors initially, and the Term of the 9th Floor subsequently, as described in Section 3 herein, the "Commencement Date" shall mean the earliest of:  (a)  the date on which Landlord substantially completes the Landlord's Work and tenders possession of the Premises to Tenant;  (b) the date on which Landlord would have substantially completed the Landlord's Work and tendered possession of the Premises to Tenant but for (i) the delay or failure of Tenant to furnish information or other matters required in the Work Letter, (ii) Tenant's request for changes in the Plans or non-Building Standard Items or (iii) any other action or inaction of Tenant, or any person or firm employed or retained by Tenant, including any Tenant Change Orders as described in the Work Letter; or (c) the date on which Tenant takes possession of the Premises.  If by the scheduled Commencement Date specified in Section 3, the Landlord's Work has not been substantially completed in accordance with the Work Letter and Landlord is unable to tender possession of the Premises to Tenant for any reason attributable solely to the Landlord (subject only to Force Majeure), and such failure renders the Premises untenantable for their intended purpose, then: (A) the Commencement Date shall be postponed until the Landlord's Work is substantially completed in accordance with the Work Letter and possession of the Premises is tendered to Tenant; (B) the Tenant shall still have twelve (12) full months with no Rent for the 10th and 11th Floors and six (6) full months with no Rent for the 9th Floor; and (C) beyond such applicable free rent period, the payment of Rent shall be abated, such abatement being calculated as two days of Rent for each day of such postponement.  The abatement of Rent under this Section 6.3(B) shall be Tenant's exclusive remedy for such postponement unless Landlord is delayed for more than three (3) months in which event Tenant shall have a right to terminate this Lease.  Such postponement shall extend the scheduled expiration of the Term for a number of days equal to the postponement.

7.    **SERVICES TO BE FURNISHED BY LANDLORD.**

7.1    **General.**  Subject to applicable Legal Requirements and the Building Standards, Landlord shall use all reasonable efforts to furnish the following services in a manner comparable to other Class A office buildings in the Louisville central business district:

(a)    Air-conditioning and heating to the Premises at all times during Building Operating Hours and, if requested by Tenant, at all times after Building Operating Hours in accordance with Section 28.13, at such temperatures and in such amounts as are considered to be standard for comfortable occupation of the Premises (thus excluding air-conditioning or heating for electronic data processing or other specialized equipment);

(b)    At all times, hot and cold water service to the Premises and at those points of supply common to all floors;

3.

(c)     Janitor service five (5) days a week comparable to that provided in other Class A office buildings in the Louisville Central Business District and periodic (but not less than twice a year) window washing in and about the Building and the Premises, provided however that Landlord will work with Tenant to ensure that any deficiencies identified by Tenant in the provision of such services are addressed immediately and to the reasonable satisfaction of Tenant;

(d)     At all times, elevator service to provide access to and egress from the Premises;

(e)     At all times electric current for normal office machines and other machines of low electrical consumption (which shall exclude electric current for electronic data processing equipment, lighting in excess of Building Standard or any other item of electrical equipment which singly consumes more than 0.5 kilowatts per hour at rated capacity or requires a voltage other than l20 volts single phase). Notwithstanding the foregoing, Landlord shall provide up to 8 watts demand load for Tenant;

(f)     Replacement of fluorescent lamps in Building Standard light fixtures installed by Landlord and of incandescent bulbs or fluorescent lamps in all public restrooms, stairwells and other common areas in the Building; and

(g)     Maintenance of Common Areas.

If any of the services described above or elsewhere in this Lease are interrupted, Landlord shall use reasonable diligence to promptly restore same. However, neither the interruption or cessation of such services nor the failure of Landlord to restore same shall render Landlord liable for damages to person or property, or be construed as an eviction of Tenant, or work an abatement of Rent or relieve Tenant from fulfilling any of its other obligations hereunder. Notwithstanding the foregoing, any such interruption lasting more than three (3) business days shall result in the abatement of Base Rent and Additional Rent as calculated in accordance with Section 6.3(B).

7.2     **Keys and Access Cards.** For Tenant's use at all times in accessing the entry and exits points of the Complex and the Building, and for accessing all areas of the Premises, Landlord shall furnish Tenant, at Landlord's expense, with two (2) keys for each lock and up to three hundred (300) access cards/badges compatible with Tenant's security system for each of Suites 900, 1000 and 1100 to correspond with the Term of the Lease. In the event Tenant needs additional or replacement access cards, Tenant will be charged $15.00 per access card. Tenant shall not install, or permit to be installed, any additional lock on any door into or in the Premises or make, or permit to be made, any duplicates of keys or access cards to the Premises. Landlord shall be entitled at all times to possession of a duplicate of all keys and access cards to all doors to or inside of the Premises. All keys and access cards referred to in this Section 7.2 shall remain the property of Landlord. Upon the expiration or termination of the Term, Tenant shall surrender all such keys to Landlord and shall deliver to Landlord the combination to all locks on all safes, cabinets and vaults which will remain in the Premises. Landlord shall be entitled to install, operate and maintain security systems in the Complex which monitor, by closed circuit television or otherwise, all persons leaving or entering the Complex, the Building and the Premises. Tenant may have its own security system inside the Premises which shall be compatible with and connected to the Building security system.

7.3     **Tenant Identity.** At Tenant's expense, Landlord shall provide and install letters or numerals identifying Tenant's name and suite number in the lobby directory, on entrance doors to the Premises and in the ground floor elevator lobby in a manner consistent with other full floor tenants and larger in the Building. Without Landlord's prior written consent, no other signs, numerals, letters, graphics, symbols or marks identifying Tenant shall be placed on the exterior or on the interior if they are visible from the exterior, of the Premises without Landlord's prior written consent.

7.4     **Charges.** Tenant shall pay to Landlord, monthly as billed, as additional Rent, such charges as may be separately metered or as Landlord may reasonably compute for (a) any utility services utilized by Tenant for computers, data processing equipment or other electrical equipment in excess of that agreed to be furnished by Landlord pursuant to Section 7.1(e), (b) lighting installed in the Premises in excess of Building Standard lighting, (c) air-conditioning, heating and other services in excess of that stated in Section 7.1(a) or provided at times other than Building Operating Hours and (d) janitorial services required with respect to Non-Building Standard Items within the Premises. No charges will exceed Landlord's actual cost. Tenant will pay for after-hours HVAC at Landlord's actual cost (multiplied by Tenant's Share if such after hours HVAC is for the entire Building). Landlord may elect to estimate the charges to be paid by Tenant under this Section 7.4 and bill such charges to Tenant monthly in advance, in which event Tenant shall promptly pay the estimated charges. When the actual charges are determined by Landlord an appropriate cash adjustment shall be made between Landlord and Tenant to account for any underpayment or overpayment by Tenant. Tenant shall pay all costs associated with providing separate utility meters to the Premises.

8.     **REPAIR AND MAINTENANCE.**

8.1     **By Landlord.** Landlord shall maintain the Building (excluding leasehold improvements which become fixtures thereto) in good condition and repair, and shall make such repairs and replacements as may be required to maintain the Building in such condition. This Section 8.1 shall not apply to damage resulting from a Taking (as to which Section 14 shall apply), or damage resulting from a casualty (as to which Section 15.1 shall apply) or to damage for which Tenant is otherwise responsible under this Lease.

8.2     **By Tenant.** Tenant shall maintain the Premises in a clean, safe, operable, attractive condition, and will not commit or allow to remain any waste or damage to any portion of the Premises. Landlord shall, after written notice to Tenant, make such repairs or replacements to the Complex damaged by Tenant, or Tenant's agent's or contractors, and the reasonable cost of such repairs or replacements actually incurred by Landlord and in excess of proceeds payable under Landlord's insurance, shall be payable to Landlord by Tenant as additional Rent upon Landlord's written demand therefor (to be accompanied by copies of receipts or paid invoices evidencing the same).

4

9.     **TAXES ON TENANT'S PROPERTY**. Tenant shall be liable for and shall pay, before their becoming delinquent, all taxes and assessments levied against any personal property placed by Tenant in the Premises (even if same becomes a fixture by operation of law or the property of Landlord by operation of this Lease), including any additional Impositions which may be assessed, levied, charged or imposed against Landlord or the Building by reason of Non-Building Standard Items in the Premises. Tenant may withhold payments of any taxes and assessments described in this Section 9 so long as Tenant contests its obligation to pay in accordance with applicable law and the non-payment thereof does not pose a threat of loss or seizure of the Building or any interest of Landlord therein.

10.     **TRANSFER BY TENANT**.

        10.1     **General**. Without the prior written consent of Landlord which consent shall not be unreasonably withheld, conditioned or delayed, Tenant shall not effect any Transfer of all or any portion of the Premises to a Transferee. Any Transfer without such consent shall be void. "**Transfer**" shall mean (a) an assignment (direct or indirect, absolute or conditional, by operation of law or otherwise) by Tenant of all or any portion of Tenant's interest in this Lease or the leasehold estate created hereby, or (b) the grant or conveyance by Tenant of any concession or license within the Premises. "**Transferee**" shall mean the assignee, sublessee, pledgee, concessionee, licensee or other transferee of all or any portion of Tenant's interest in this Lease, the leasehold estate created hereby or the Premises. If Tenant desires to effect a Transfer, it shall deliver to Landlord written notice thereof in advance of the date on which Tenant proposes to make the Transfer, together with all of the terms of the proposed Transfer and the identity of the proposed Transferee. Landlord shall have ten (10) business days following receipt of the notice and information within which to notify Tenant in writing whether Landlord elects to refuse to consent to the Transfer or to permit Tenant to effect the proposed Transfer. If Landlord fails to notify Tenant of its election within said 10-day period, Landlord shall be deemed to have permitted Tenant to effect the Transfer. The consent by Landlord to a particular Transfer shall not be deemed a consent to any other Transfer. If a Transfer occurs without the prior written consent of Landlord as provided herein, Landlord may nevertheless collect rent from the Transferee and apply the net amount collected to the Rent payable hereunder, but such collection and application shall not constitute a waiver of the provisions hereof or a release of Tenant from the further performance of its obligations hereunder. The consent by Landlord to a particular Transfer shall not entitle Landlord to participation, recapture or to the right to change any terms of the Lease. Tenant shall have the right to advertise the availability of all or any portion of the Premises without restriction as to the rental rate so advertised. Any profits that are derived by Tenant's Transfer shall be split with Landlord on a 50/50 basis after deducting all reasonable costs associated with effecting such Transfer.

Notwithstanding the forgoing, upon thirty (30) days written notice to Landlord, Tenant may effect a Transfer to a Tenant Related Party without the consent of Landlord. "**Tenant Related Party**" shall mean Tenant's affiliates, working partnerships, subsidiaries or successors by merger, consolidation or any change of ownership or power to vote a majority of the voting stock (being the shares of stock regularly entitled to vote for the election of directors) in Tenant outstanding at the time of execution of this Lease. If Tenant desires to effect a Transfer to a Tenant Related Party, it shall deliver to Landlord written notice thereof in advance of the date on which Tenant proposes to make the Transfer, together with all of the terms of the proposed Transfer and the identity of the Tenant Related Party. Such a Transfer to a Tenant Related Party shall not entitle Landlord to participation, recapture or to the right to change any terms of the Lease. Landlord and Tenant agree not to share in any profits derived by Tenant in effecting a Transfer to a Tenant Related Party.

        10.2     **Conditions to Transfer**. The following conditions shall automatically apply to each Transfer, without the necessity of same being stated in or referred to in any applicable Landlord's written consent:

                (a)   Tenant shall execute, have acknowledged and deliver to Landlord, and cause the Transferee or the Tenant Related Party, as the case may be, to execute, have acknowledged and deliver to Landlord, an instrument in form and substance reasonably acceptable to Landlord in which: (i) with respect to such Transferees, the Transferee adopts this Lease and agrees to perform all of the obligations of Tenant hereunder (except payment of Rent), as to the space transferred to it; (ii) Tenant and the Transferee or Tenant Related Party agree to provide to Landlord, at their expense, direct access from a public corridor in the Building to the transferred space; (iii) the Transferee or Tenant Related Party agrees to use and occupy the transferred space solely for the purpose specified in Section 4 and otherwise in strict accordance with this Lease; and (iv) Tenant acknowledges that, notwithstanding the Transfer, Tenant remains directly and primarily liable for the performance of all the obligations of Tenant hereunder (including, without limitation, the obligation to pay all Rent), and Landlord shall be permitted to enforce this Lease against Tenant and the Tenant Related Party or the Transferee as the case may be, or both, without prior demand upon or proceeding in any way against any other persons, and

                (b)   Tenant shall deliver to Landlord a counterpart of all instruments relative to the Transfer executed by all parties to such transaction (except Landlord).

        10.3     **Liens**. Without in any way limiting the generality of the foregoing, Tenant shall not grant, place or suffer, or permit to be granted, placed or suffered, against the Complex or any portion thereof, any lien, security interest, pledge, conditional sale contract, claim, charge or encumbrance (whether constitutional, contractual or otherwise) and if any of the aforesaid does arise or is asserted, Tenant will, promptly upon demand by Landlord and at Tenant's expense, cause same to be released.

11.     **ALTERATIONS**. Tenant shall not make, or permit to be made, any alteration, improvement or addition to, or install, or permit to be installed, any fixture or equipment (other than desk top electrical equipment) in the Premises without the prior written consent of Landlord which consent shall not be unreasonably withheld, delayed or conditioned. Tenant shall have the right, without the prior written consent of Landlord, to make non-structural, cosmetic alterations with an aggregate cost of less than Fifty Thousand Dollars ($50,000.00) provided that Tenant notifies Landlord at least five (5) business days in advance of the nature and extent of such proposed alterations and provided further that any such alterations shall be made in a good and workmanlike manner and shall be made in accordance with the terms and conditions of this Lease and shall not affect any areas of the Building or the Complex other than the Premises. All such alterations, improvements and additions (including all articles attached to the floor, wall or ceiling of the Premises) shall become the property of Landlord and shall, at Landlord's election, be (a)

5

surrendered with the Premises as part thereof at the termination or expiration of the Term, without any payment, reimbursement or compensation therefor, or (b) removed by Tenant, at Tenant's expense, with all damage caused by such removal repaired by Tenant. Tenant may remove Tenant's trade fixtures, office supplies, movable office furniture and equipment not attached to the Building provided such removal is made within five days after the expiration of the Term, no uncured Event of Default has occurred and Tenant promptly repairs all damage caused by such removal. With respect to such alterations, Landlord shall not be entitled to any such construction management fee.

12.   **SPECIFICALLY PROHIBITED USES.** Tenant will not (a) use, occupy or permit the use or occupancy of the Premises for any purpose or in any manner which is or may be, directly or indirectly, violative of any Legal Requirement, or dangerous to life or property, or a public or private nuisance or disruptive or obstructive of any other tenant of the Building, (b) keep, or permit to be kept, any substance in or conduct, or permit to be conducted, any operation from the Premises which might emit offensive odors or conditions into other portions of the Building, or make undue noise or create undue vibrations, (c) commit or permit to remain any waste to the Premises, (d) install or permit to remain any improvements to the Premises (other than window coverings which have first been approved by Landlord) which are visible from the outside of the Premises, or exceed the structural loads of floors or walls of the Building, or adversely affect the mechanical, plumbing or electrical systems of the Building or affect the structural integrity of the Building in any way, (e) install any food, soft drink or other vending machine (other than those for the exclusive, non-commercial use of Tenant and its business invitees) in the Premises or (f) commit, or permit to be committed, any action or circumstance in or about the Building which, directly or indirectly, would or might justify any insurance carrier in canceling or increasing the premium on the fire and extended coverage insurance policy maintained by Landlord on the Building or contents, and if any increase results from any act of Tenant, then Tenant shall pay such increase promptly upon demand therefor by Landlord.

13.   **ACCESS BY LANDLORD.** Landlord, its employees, contractors, agents and representatives, shall have the right (and Landlord, for itself and such persons and firms, hereby reserves the right) to enter the Premises at all hours after providing Tenant 24 hours prior written notice (except as set forth below in the case of an Emergency), (a) to inspect, clean, maintain, repair, replace or alter the Premises or the Building, (b) to show the Premises to prospective purchasers (or, during the last 6 months of the Term, to prospective tenants), (c) to determine whether Tenant is performing its obligations hereunder and, if it is not, to perform same at Landlord's option and Tenant's expense or (d) for any other purpose deemed reasonable by Landlord. "**Emergency**" shall mean any situation determined by Landlord, in the exercise of reasonable business judgment, where action is immediately necessary to be taken by Landlord for the preservation of any portion of the Premises from damage or destruction or for the safety and security of persons. In an Emergency, Landlord (and such persons and firms) may use any means to open any door into or in the Premises without any liability therefor and without notice to Tenant. Entry into the Premises by Landlord or any other person or firm named in the first sentence of this Section 13 for any purpose permitted herein shall not constitute a trespass or an eviction (constructive or otherwise), or entitle Tenant to any abatement or reduction of Rent, or constitute grounds for any claim (and Tenant hereby waives any claim) for damages for any injury to or interference with Tenant's business, for loss of occupancy or quiet enjoyment or for consequential damages so long as Landlord uses its best efforts to minimize any interference with Tenant's business operations.

14.   **CONDEMNATION.** If all of the Complex is Taken, or if so much of the Complex is Taken that, in Landlord's reasonable opinion, the remainder cannot be restored to an economically viable, quality office building, or if the awards payable to Landlord as a result of any Taking are, in Landlord's opinion, inadequate to restore the remainder to an economically viable, quality office building, Landlord may, at its election, exercisable by the giving of written notice to Tenant within 60 days after the date of the Taking, terminate this Lease as of the date of the Taking or the date Tenant is deprived of possession of the Premises (whichever is later). If this Lease is not terminated as result of a Taking, Landlord shall restore the Premises remaining after the Taking to a Building Standard condition. During the period of restoration, Rent shall be abated to the extent the Premises are rendered untenantable and, after the period of restoration, Rent and Tenant's Share shall be reduced in the proportion that the area of the Premises Taken or otherwise rendered untenantable bears to the area of the Premises just prior to the Taking; provided, however, if in Tenant's reasonable opinion it cannot conduct its business operations in the same manner as before the Taking, Tenant shall have a right to terminate this Lease. If any portion of Rent is abated under this Section 14, Landlord may elect to extend the expiration date of the Term for the period of the abatement. All awards, proceeds, compensation or other payments from or with respect to any Taking of the Complex or any portion thereof shall belong to Landlord, Tenant hereby assigning to Landlord all of its right, title, interest and claim to same. Tenant may assert a claim for and recover from the condemning authority, but not from Landlord, such compensation as may be awarded on account of Tenant's moving and relocation expenses, and depreciation to and loss of Tenant's moveable personal property.

15.   **CASUALTY.**

15.1   **General.** Tenant shall give prompt written notice to Landlord of any casualty to the Complex of which Tenant is aware and any casualty to the Premises. If the Complex or the Premises are totally destroyed, or if the Complex or the Premises are partially destroyed but in Landlord's opinion, they cannot be restored to an economically viable, quality office building, or if the insurance proceeds payable to Landlord as a result of any casualty are, in Landlord's reasonable opinion, inadequate to restore the portion remaining to an economically viable and quality office building, Landlord may, at its election exercisable by the giving of written notice to Tenant within 60 days after the casualty, terminate this Lease as of the date of the casualty or the date Tenant is deprived of possession of the Premises (whichever is later). If this Lease is not terminated as a result of a casualty, Landlord shall restore the Premises to a Building Standard condition. During the period of restoration, Rent shall be abated to the extent the Premises are rendered untenantable and, after the period of restoration, Rent and Tenant's Share shall be reduced in the proportion that the area of the Premises remaining tenantable after the casualty bears to the area of the Premises just prior to the casualty; provided, however, if in Tenant's reasonable opinion it cannot conduct its business operations in the same manner as before the casualty, Tenant shall have a right to terminate this Lease. If any portion of Rent is abated under this Section 15.1, Landlord may elect to extend the expiration date of the Term for the period of the abatement.

15.2    **Acts of Tenant**. Notwithstanding any provisions of this Lease to the contrary, if the Premises or the Complex are damaged or destroyed as a result of a casualty arising from the intentional or grossly negligent acts or omissions of Tenant, or any of Tenant's officers, directors, shareholders, partners, employees, contractors, agents, invitees or representatives, and such loss is not covered by applicable insurance, Tenant's obligation to pay Rent and to perform its other obligations under this Lease shall not be abated, reduced or altered in any manner.

16.    **SUBORDINATION, NON DISTURBANCE AND ATTORNMENT**.

16.1    **General**. This Lease, Tenant's leasehold estate created hereby and all of Tenant's rights, titles and interests hereunder and in and to the Premises are subject and subordinate to any Mortgage presently existing or hereafter placed upon all or any portion of the Complex. However, Landlord and Landlord's Mortgagee may, at any time upon the giving of written notice to Tenant and without any compensation or consideration being payable to Tenant, make this Lease, and the aforesaid leasehold estate and rights, titles and interests, superior to any Mortgage. Upon the written request by Landlord or by Landlord's Mortgagee to Tenant, and within ten 10) Business Days of the date of such request, and without any compensation or consideration being payable to Tenant, Tenant shall execute, have acknowledged and deliver a recordable instrument confirming that this Lease, Tenant's leasehold estate in the Premises and all of Tenant's rights, titles and interests hereunder are subject and subordinate (or, at the election of Landlord or Landlord's Mortgagee, superior) to the Mortgage benefiting Landlord's Mortgagee, so long as such recordable instrument also provides that Tenant's occupancy of the Premises will not be disturbed as long as Tenant is not in default under the Lease.

16.2    **Attornment**. Upon the written request of any person or party succeeding to the interest of Landlord under this Lease, Tenant shall automatically become the tenant of and attorn to such successor in interest without any change in any of the terms of this Lease. No successor in interest shall be (a) bound by any payment of Rent for more than one month in advance, except payments of security for the performance by Tenant of Tenant's obligations under this Lease, (b) subject to any offset, defense or damages arising out of a default or any obligations of any preceding Landlord or (c) bound by any amendment of this Lease entered into after Tenant has been given written notice of the name and address of Landlord's Mortgagee and without the written consent of Landlord's Mortgagee or such successor in interest. The subordination, attornment and mortgage protection clauses of this Section 16 shall be self-operative and no further instruments of subordination, attornment or mortgage protection need be required by any Mortgagee or successor in interest thereto. Nevertheless, upon the written request therefor and without any compensation or consideration being payable to Tenant, Tenant agrees to execute, have acknowledged and deliver such instruments as may be requested to confirm the same.

16.3    **Non-Disturbance**. Within thirty (30) days from the Effective Date, Landlord will provide Tenant with an acceptable Non-Disturbance Agreement executed by Landlord's Mortgagee. Thereafter, on request by Tenant in connection with any assignment of this Lease or any sublease of one-half floor or more, Landlord will provide an acceptable Non-Disturbance Agreement executed by Landlord's Mortgagee within thirty (30) days of such request.

17.    **INSURANCE**.

17.1    **General**. Tenant shall obtain and maintain throughout the Term the following policies of insurance:

(a)    fire and all risk insurance, with vandalism, malicious mischief and sprinkler leakage endorsements, on all of Tenant's personal property located in, and on all Non-Building Standard Items to, the Premises in an amount not less than eighty percent of the replacement cost thereof;

(b)    comprehensive general and contractual liability insurance against claims for personal injury, bodily injury, death and property damage occurring in or about the Premises, such insurance to afford protection to the limits of not less than $1,000,000 per occurrence;

(c)    insurance required hereunder shall be written by companies licensed or admitted to do business in the State of Kentucky and shall have a minimum rating of A-:VIII by A.M. Best's Key Rating Guide.

(d)    such other policy or policies of insurance as Landlord may reasonably require.

Tenant shall deliver to Landlord, prior to the Commencement Date, certificates of such insurance and thereafter upon each policy renewal date. The policy described in clause (b) above (I) name Landlord as an additional insured, (ii) Tenant shall provide that it will not be canceled, reduced or non-renewed without 30-days' prior written notice to Landlord, (iii) insure performance of the indemnities of Tenant contained in Section 18 and elsewhere in this Lease and (iv) be primary coverage, so that any insurance coverage obtained by Landlord shall be in excess thereto. All policies of insurance required to be obtained and maintained by Tenant shall be subject to the reasonable approval of Landlord as to terms, coverage, deductibles and issuer.

17.2    **WAIVER OF SUBROGATION**. Landlord and Tenant hereby waive all claims, rights of recovery and causes of action that either party or any party claiming by, through or under such party may now or hereafter have by subrogation or otherwise against the other party or against any of the other party's officers, directors, shareholders, partners or employees for any loss or damage that may occur to the Complex, the Premises, Tenant's improvements or any of the contents of any of the foregoing by reason of fire or other casualty, or by reason of any other cause except gross negligence or willful misconduct (thus including simple negligence of the parties hereto or their officers, directors, shareholders, partners or employees), that could have been insured against under the terms of (a) in the case of Landlord, the standard fire and extended coverage insurance policies available in the state where the Complex is located at the time of the casualty and (b) in the case of Tenant, the fire and extended coverage insurance policy required to be obtained and maintained under Section 17.1; provided, however, that the waiver set forth in this Section 17.2 shall not apply to any deductibles on insurance policies carried by Landlord or to any coinsurance penalty which Landlord might sustain. Landlord and Tenant shall cause an endorsement to be issued to their respective insurance policies recognizing this waiver of subrogation.

7

18.   **INDEMNITIES**. Subject to Section 17.2, and except to the extent arising solely from negligence or willful misconduct of Landlord or its agents or employees, Tenant agrees to indemnify and save harmless Landlord and Landlord's officers, directors, shareholders, partners and employees from and against, all liabilities, obligations, losses, damages, penalties, claims, actions, suits, costs, expenses and disbursements (including court costs and reasonable attorneys' fees) arising: (i) from any accident, injury or damage whatsoever to any person, or to the property of any person, occurring in or about the Premises; (ii) from any accident, injury or damage whatsoever to any person, or to the property of any person, occurring outside of the Premises but on or about the Complex, where such accident, damage or injury results or is claimed to have resulted from any act or omission on the part of Tenant or Tenant's agents, employees or contractors; of (iii) any breach or default on the part of Tenant in the performance of any term, covenant, condition, obligation or agreement on the part of Tenant to be performed or met under this Lease. Except to the extent arising solely from negligence or willful misconduct of Tenant or its agents or employees, Landlord agrees to indemnify and save harmless Tenant and Tenant's shareholders, officers, directors, managers, employees, agents and contractors from and against all claims, losses, cost, damages, liability or expenses of whatever nature arising: (i) from any accident, injury or accident, injury or damage whatsoever to any person, or to the property of any person, occurring outside of the Premises but on or about the Complex, where such accident, damage or injury results or is claimed to have resulted from any act or omission on the part of Landlord or Landlord's agents, employees or contractors; or (ii) any breach or default on the part of Landlord in the performance of any term, covenant, condition, obligation or agreement on the part of Landlord to be performed or met under this Lease.

19.   **THIRD PARTIES; ACTS OF FORCE MAJEURE**. Landlord shall have no liability to Tenant, or to Tenant's officers, directors, shareholders, partners, employees, agents, contractors or invitees, for bodily injury, death, property damage, business interruption, loss of profits, loss of trade secrets or other direct or consequential damages occasioned by (a) the acts or omissions of any other tenant or such other tenant's officers, directors, shareholders, partners, employees, agents, contractors or other invitees within the Complex, (b) Force Majeure, (c) vandalism, theft, burglary and other criminal acts (other than those committed by Landlord), (d) water leakage or (e) the repair, replacement, maintenance, damage, destruction or relocation of the Premises.

20.   **[Reserved.]**

21.   **CONTROL OF COMMON AREAS**. Landlord shall have the exclusive control over the Common Areas. Landlord may, from time to time, create different Common Areas, close or otherwise modify the Common Areas, and modify the Building Rules and Regulations with respect thereto so long as such modifications are reasonable and uniformly applied.

22.   **[Reserved.]**

23.   **QUIET ENJOYMENT**. Provided Tenant has performed all its obligations under this Lease, Tenant shall and may peaceably and quietly have, hold, occupy, use and enjoy the Premises during the Term subject to the provisions of this Lease. Landlord shall warrant and forever defend Tenant's right to occupancy of the Premises against the claims of any and all persons whomsoever lawfully claiming the same or any part thereof, by, through or under Landlord, but not otherwise, subject to the provisions of this Lease.

24.   **DEFAULT BY TENANT**.

24.1   **Events of Default**. Each of the following occurrences shall constitute an Event of Default (herein so called):

(a)   The failure of Tenant to pay Rent as and when due hereunder and the continuance of such failure for a period of five (5) days after receipt of written notice from Landlord to Tenant specifying the failure; provided, however, Landlord shall not be required to give Tenant written notice pursuant to this clause (a) more than twice in any 12 month period;

(b)   The failure of Tenant to perform, comply with or observe any other agreement, obligation or undertaking of Tenant, or any other term, condition or provision, in this Lease, and the continuance of such failure for a period of thirty (30) days after receipt of written notice from Landlord to Tenant specifying the failure and such additional time as may be reasonably necessary to cure such failure;

(c)   The filing of a petition by or against Tenant (the term "Tenant" also meaning, for the purpose of this clause (c), any guarantor of the named Tenant's obligations hereunder) (i) in any bankruptcy or other insolvency proceeding, (ii) seeking any relief under the Bankruptcy Code or any similar debtor relief law, (iii) for the appointment of a liquidator or receiver for all or substantially all of Tenant's property or for Tenant's interest in this Lease or (iv) to reorganize or modify Tenant's capital structure;

(d)   The admission by Tenant in writing that it cannot meet its obligations as they become due or the making by Tenant of an assignment for the benefit of its creditors.

24.2   **Remedies of Landlord**. Upon any Event of Default, Landlord may, at Landlord's option and in addition to all other rights, remedies and recourses afforded Landlord hereunder or by law or equity, do any one or more of the following:

(a)   Terminate this Lease by the giving of written notice to Tenant, in which event Tenant shall pay to Landlord the sum of (i) all Rent and other amounts accrued hereunder to the date of termination and (ii) all amounts due under Section 24.3.

(b)   Terminate Tenant's right to possession of the Premises without terminating this Lease by the giving of written notice to Tenant, in which event Tenant shall pay to Landlord (i) all Rent and other amounts accrued hereunder to the date of termination of possession, (ii) all amounts due from time to time under Section 24.3 and (iii) all Rent and other sums required hereunder to be paid by Tenant

8

during the remainder of the Term as they come due, diminished by any net sums thereafter received by Landlord through reletting the Premises during said period. Reentry by Landlord in the Premises will not affect the obligations of Tenant hereunder for the unexpired Term. Landlord may bring action against Tenant to collect amounts due by Tenant on one or more occasions, without the necessity of Landlord's waiting until expiration of the Term. If Landlord elects to proceed under this Section 24.2(b), it may at any time elect to terminate this Lease pursuant to Section 24.2(a).

(c)     If an Event of Default specified in Section 24.1(c) occurs, Landlord may remove and store any property that remains on the Premises, and, if Tenant does not claim such property within ten days after Landlord has delivered to Tenant notice of such storage, Landlord may appropriate, sell, destroy, or otherwise dispose of the property in question without notice to Tenant or any other person and without any obligation to account for such property.

24.3     **Payment by Tenant**. Upon any Event of Default, Tenant shall also pay to Landlord all costs and expenses incurred by Landlord, including court costs and reasonable attorneys' fees, in (a) retaking or otherwise obtaining possession of the Premises, (b) removing and storing Tenant's or any other occupant's property, (c) repairing, restoring, altering, remodeling or otherwise putting the Premises into condition acceptable to a new tenant or tenants, (d) reletting all or any part of the Premises, (e) paying or performing the underlying obligation which Tenant failed to pay or perform and (f) enforcing any of Landlord's rights, remedies or recourses arising as a consequence of the Event of Default.

24.4     **Reletting**. Upon termination of this Lease or upon termination of Tenant's right to possession of the Premises, Landlord shall use reasonable efforts to relet the Premises on such terms and conditions as Landlord in its sole discretion may determine (including a term different than the Term, rental concessions, and alterations to, and improvements of, the Premises); however, Landlord shall not be obligated to relet the Premises before leasing other portions of the Building. Landlord shall not be liable, nor shall Tenant's obligations hereunder be diminished because of, Landlord's failure to relet the Premises or collect rent due in respect of such reletting. Tenant shall not be entitled to the excess of any rent obtained by reletting over the Rent herein reserved.

24.5     **Landlord's Right to Pay or Perform**. Upon an Event of Default, Landlord may, but without obligation to do so and without thereby waiving or curing such Event of Default, pay or perform the underlying obligation for the account of Tenant, and enter the Premises for such purpose.

24.6     **No Waiver; No Implied Surrender**. Provisions of this Lease may only be waived by the party entitled to the benefit of the provision evidencing the waiver in writing. Thus, neither the acceptance of Rent by Landlord following an Event of Default (whether known to Landlord or not), nor any other custom or practice followed in connection with this Lease, shall constitute a waiver by Landlord of such Event of Default or any other Event of Default. Further, the failure by Landlord to complain of any action or inaction by Tenant, or to assert that any action or inaction by Tenant constitutes (or would constitute, with the giving of notice and the passage of time) an Event of Default, regardless of how long such failure continues, shall not extinguish, waive or in any way diminish the rights, remedies and recourses of Landlord with respect to such action or inaction. No waiver by Landlord of any provision of this Lease or of any breach by Tenant of any obligation of Tenant hereunder shall be deemed to be a waiver of any other provision hereof, or of any subsequent breach by Tenant of the same or any other provision hereof. Landlord's consent to any act by Tenant requiring Landlord's consent shall not be deemed to render unnecessary the obtaining of Landlord's consent to any subsequent act of Tenant. No act or omission by Landlord (other than Landlord's execution of a document acknowledging such surrender) or Landlord's agents, including the delivery of the keys to the Premises, shall constitute an acceptance of a surrender of the Premises.

25.     **DEFAULTS BY LANDLORD**. Landlord shall not be in default under this Lease, and Tenant shall not be entitled to exercise any right, remedy or recourse against Landlord or otherwise as a consequence of any alleged default by Landlord under this Lease, unless Landlord fails to perform any of its obligations hereunder and said failure continues for a period of 30 days after Tenant gives Landlord and (provided that Tenant shall have been given the name and address of Landlord's Mortgagee) Landlord's Mortgagee written notice thereof specifying, with reasonable particularity, the nature of Landlord's failure. If, however, the failure cannot reasonably be cured within the 30-day period, Landlord shall not be in default hereunder if Landlord or Landlord's Mortgagee commences to cure the failure within the 30 days and thereafter pursues the curing of same diligently to completion. If Tenant recovers a money judgment against Landlord for Landlord's default of its obligations hereunder or otherwise, the judgment shall be limited to Tenant's actual direct, but not consequential, damages therefor and shall be satisfied only out of the interest of Landlord in the Complex as the same may then be encumbered, and Landlord shall not otherwise be liable for any deficiency. In no event shall Tenant have the right to levy execution against any property of Landlord other than its interest in the Complex. The foregoing shall not limit any right that Tenant might have to obtain specific performance of Landlord's obligations hereunder.

26.     **RIGHT OF REENTRY**. Upon the expiration or termination of the Term for whatever cause, or upon the exercise by Landlord of its right to re-enter the Premises without terminating this Lease, Tenant shall immediately, quietly and peaceably surrender to Landlord possession of the Premises in "broom clean" and good order, condition and repair, except only for ordinary wear and tear, damage by casualty and repairs to be made by Landlord pursuant to Section 15.1. If Tenant fails to surrender possession as herein required, Landlord may, without giving Tenant prior notice to vacate the Premises or any other notice, initiate any and all legal action as Landlord may elect to dispossess Tenant and all of its property, and all persons or firms claiming by, through or under Tenant and all of their property, from the Premises, and may remove from the Premises and store (without any liability for loss, theft, damage or destruction thereto) any such property at Tenant's cost. While Tenant remains in possession of the Premises after such expiration, termination or exercise by Landlord of its re-entry right, Tenant shall be deemed to be occupying the Premises as a tenant-at-sufferance, subject to all of the obligations of Tenant under this Lease, except that the daily Base Rent shall be 150% of the per day Base Rent in effect immediately before such expiration, termination or exercise by Landlord for the first sixty (60) days and thereafter, Base Rent shall be 200% of the per day Base Rent in effect immediately before such expiration, termination or exercise by Landlord. No such holding over shall extend the Term. If Tenant fails to surrender possession of the Premises in the condition herein required, Landlord may, at Tenant's expense, restore the Premises to such condition.

27.    **MISCELLANEOUS.**

27.1    **Independent Obligations; No Offset.**  The obligations of Tenant to pay Rent and to perform the other undertakings of Tenant hereunder constitute independent unconditional obligations to be performed at the times specified hereunder, regardless of any breach or default by Landlord hereunder.  Tenant shall have no right, and Tenant hereby waives and relinquishes all rights which Tenant might otherwise have, to claim any nature of lien against the Complex or to withhold, deduct from or offset against any Rent or other sums to be paid to Landlord by Tenant.

27.2    **Time of Essence.**  Time is of the essence with respect to each date or time specified in this Lease by which an event is to occur.

27.3    **Applicable Law.**  This Lease shall be governed by, and construed in accordance with, the laws of the State of Kentucky.  All monetary and other obligations of Landlord and Tenant are performable in the county where the Complex is located.

27.4    **Assignment by Landlord.**  Landlord shall have the right to assign, in whole or in part, any or all of its rights, titles or interests in and to the Complex or this Lease and, upon any such assignment, Landlord shall be relieved of all unaccrued liabilities and obligations hereunder to the extent of the interest so assigned.

27.5    **Commencement Date and Estoppel Certificates.**  From time to time at the request of Landlord or Landlord's Mortgagee, Tenant will promptly and without compensation or consideration execute, have acknowledged and deliver a certificate stating (a) the Commencement Date and the date of expiration of the Term, (b) the rights (if any) of Tenant to extend the Term or to expand the Premises, (c) the Rent (or any components of the Rent) currently payable hereunder, (d) whether this Lease has been amended in any respect and, if so, submitting copies of or otherwise identifying the amendments, (e) whether, within the knowledge of Tenant, there are any existing breaches or defaults by Landlord hereunder and, if so, stating the defaults with reasonable particularity and (f) such other information pertaining to this Lease as Landlord or Landlord's Mortgagee may reasonably request.

27.6    **Signs, Building Name and Building Address.**  Landlord may, from time to time at its discretion, maintain any and all signs anywhere in the Complex, and to change the name and street address of the Complex.  Tenant shall not use the name of the Building for any purpose other than as the address of the business to be conducted by Tenant from the Premises.

27.7    **Notices/Payments.**  All notices and other communications given pursuant to this Lease shall be in writing and shall either be made by first class United States mail, postage prepaid, registered or certified with return receipt requested, and addressed as set forth in this Section 27.7, or delivered in person to the intended addressee, or sent by prepaid telegram, cable or telex followed by a confirmatory letter or sent by Federal Express or comparable overnight delivery service.  Notice mailed in the aforesaid manner shall become effective three business days after deposit; notice given in any other manner, and any notice given to Landlord, shall be effective only upon receipt by the intended addressee.  Each party shall have the continuing right to change its address for notice hereunder by the giving of 15 days' prior written notice to the other party in accordance with this Section 27.7.

NOTICE ADDRESS:

<u>Landlord:</u>
DOF IV Meidinger Tower LLC
c/o Torchlight Investors
475 Fifth Avenue
New York, NY  10017

<u>Tenant:</u>
Computershare, Inc.
2 North LaSalle Street
Chicago, IL 60602
Attn: Facility Manager

<u>With a copy to:</u>
Trimont Real Estate Advisors, Inc.
Attn: Mitchell Hunter
3424 Peachtree Road, Suite 2200
Atlanta, Ga 30326

<u>With a copy to:</u>
Computershare, Inc.
480 Washington Boulevard
Jersey City, New Jersey 07310
Attn: Legal Department

<u>Payment Address:</u>
DOF IV Meidinger Tower LLC
c/o Management Office
462 S. 4th Street, Suite 400
Louisville, KY 40202

27.8    **Entire Agreement, Amendment and Binding Effect.**  This Lease constitutes the entire agreement between Landlord and Tenant relating to the subject matter hereof and all prior agreements relative hereto which are not contained herein are terminated.  This Lease may be amended only by a written document duly executed by Landlord and Tenant (and, if a Mortgage is then in effect, by the Landlord's Mortgagee entitled to the benefits thereof), and any alleged amendment which is not so documented shall not be effective as to either party.  The provisions of this Lease shall be binding upon and inure to the benefit of the parties hereto and their heirs, executors, administrators, successors and assigns; provided, however, that this Section 27.8 shall not negate, diminish or alter the restrictions on Transfers applicable to Tenant set forth elsewhere in this Lease.

27.9    **Severability.**  This Lease is intended to be performed in accordance with and only to the extent permitted by all Legal Requirements.  If any provision of this Lease or the application thereof to any person or circumstance shall, for any reason and to any extent, be invalid or unenforceable, but the extent of the invalidity or unenforceability does not destroy the basis of the bargain between the parties as contained herein, the remainder of

10

this Lease and the application of such provision to other persons or circumstances shall not be affected thereby, but rather shall be enforced to the greatest extent permitted by law.

27.10 **Number and Gender, Captions and References.** As the context of this Lease may require, pronouns shall include natural persons and legal entities of every kind and character, the singular number shall include the plural and the neuter shall include the masculine and the feminine gender. Section headings in this Lease are for convenience of reference only and are not intended, to any extent and for any purpose, to limit or define any section hereof. Whenever the terms "hereof," "hereby," "herein", "hereunder" or words of similar import are used in this Lease, they shall be construed as referring to this Lease in its entirety rather than to a particular section or provision, unless the context specifically indicates to the contrary. Any reference to a particular "Section" shall be construed as referring to the indicated section of this Lease.

27.11 **Attorneys' Fees.** If either party hereto initiates any litigation against the other party relating to this Lease, the prevailing party shall be entitled to recover, in addition to all damages allowed by law and other relief, all court costs and reasonable attorneys' fees incurred in connection with such litigation.

27.12 **Brokers.** Tenant and Landlord hereby warrant and represent unto the other that it has not incurred or authorized any brokerage commission, finder's fees or similar payments in connection with this Lease, other than that which is due to Newmark Grubb Knight Frank and NAI Fortis Group, which payment shall be paid by Landlord in accordance with the terms of a separate agreement. Each party shall defend, indemnify and hold the other harmless from and against any claim for brokerage commission, finder's fees or similar payment arising by virtue of authorization of such party, or any Affiliate of such party, in connection with this Lease.

27.13 **Interest on Tenant's Obligations.** Any amount due from Tenant to Landlord which is not paid when due shall bear interest at the lesser of 5% or the maximum rate allowed by law from the date such payment is due until paid, but the payment of such interest shall not excuse or cure the default in payment.

27.14 **Authority.** The person executing this Lease on behalf of a party hereto personally warrants and represents to the other party that (a) such party is a duly organized and existing legal entity, in good standing in the state of its organization or incorporation; (b) such party has full right and authority to execute, deliver and perform this Lease; (c) the person executing this Lease on behalf of such party was authorized to do so; and (d) upon request of the other party, such person will deliver satisfactory evidence of his or her authority to execute this Lease.

27.15 **Recording.** Neither this Lease (including any Exhibit hereto) nor any memorandum hereof shall be recorded without the prior written consent of Landlord.

27.16 **Exhibits.** All Exhibits and written addenda hereto are incorporated herein for any and all purposes.

27.17 **Multiple Counterparts.** This Lease may be executed in two or more counterparts, each of which shall be an original, but all of which shall constitute but one instrument.

28. **SPECIAL STIPULATIONS.** In the event that any provisions of this Lease are in conflict with this Section 28, this Section 28 shall control the rights and obligations of the parties.

28.1 **Advance Entry by Tenant.** With respect to the 10th and 11th Floors, Landlord shall permit Tenant and its employees, agents, contractors and suppliers advance entry upon the Effective Date (and such entry, alone, shall not constitute Tenant's taking possession of the Premises for the purpose of Section 6.3(c)) so that Tenant may make Tenant Improvements in accordance with the Work Letter prior to Tenant's occupancy on April 1, 2015.

With respect to the 9th Floor, Landlord shall permit Tenant and its employees, agents, contractors and suppliers advance entry (and such entry, alone, shall not constitute Tenant's taking possession of the Premises for the purpose of Section 6.3(c)) not later than October 1, 2015 and for a period of at least 6 months so that Tenant may make Tenant Improvements in accordance with the Work Letter prior to Tenant's occupancy on April 1, 2016.

28.2 **Option to Renew.** Provided Tenant is not in default of the terms of the Lease beyond any applicable cure period herein, Tenant shall have one (1) option (the **"Renewal Option"**) to extend the Lease Term for a period of up to three (3) years but not less than one (1) year (**"Renewal Period"**). The Renewal Period shall commence at 5:01 p.m. on the Expiration Date of the initial term of this Lease (the **"Renewal Period Commencement Date"**). As a condition of Tenant's exercise of its option for the Renewal Period, Tenant must satisfy the following conditions:

(a) The space identified by Tenant for renewal, if less than all of the space then under lease at the time of Tenant's exercise of the Renewal Option, may be no less than one (1) full floor and under no circumstances may Tenant give back a portion of a floor that Tenant currently occupies as a full floor.

(b) Tenant must notify Landlord, in writing, of its intention to exercise the Renewal Option not later than two hundred seventy (270) days prior to the Expiration Date of the Lease.

(c) The Base Rent during the Renewal Period shall equal either (1) a rental rate mutually agreed to between Landlord and Tenant, or (2) ninety five percent (95%) of the "Current Market Rental Rate" (hereinafter defined), as determined in accordance with the following paragraph below.

(d) Tenant shall pay to Landlord Additional Rent during the Renewal Period under the same terms and conditions as described in the Lease.

11

(e)      Failure by Tenant to satisfy the conditions set out hereinabove for the Renewal Period shall result in the termination of the Renewal Option.

The rental rate for the Renewal Period shall be a rate to be negotiated between Landlord and Tenant commencing with the beginning of the final year of the current Lease Term. Landlord and Tenant shall endeavor in good faith within the first sixty (60) days of the last year of the initial term to agree upon a rental rate for the Renewal Period. Such rental rate shall include the fixed percentage rate to calculate annual increases in Base Rent during such Renewal Period. However, if Landlord and Tenant are unable to agree within such sixty (60) day period, then Landlord and Tenant shall each within the next fifteen (15) days name an appraiser to represent them, and the two so appointed shall endeavor to jointly agree on the then Current Market Rental Rate of the Premises (including the fixed percentage rate for annual rent increases). As used in this Lease, **"Current Market Rental Rate"** shall mean the market annual rental rate per square foot for renewals of existing leases, for the applicable space and for the time as to which such rate is being determined, that a willing tenant would pay and a willing landlord would accept, in arm's length bona fide negotiations (for renewal leases taking into consideration all relevant factors for renewal leases including, without limitation, the following factors: rent being charged in other similar buildings located in the central business district of Louisville, Kentucky for comparable tenants, for renewal leases then being entered into for comparable space to the Premises; location, quality, amenities, age and reputation of the buildings in which the space being compared is located; use and size of the space under comparison; location and/or floor level of the subject space and any comparison space within their respective buildings; extent of services provided or to be provided; extent and condition of leasehold improvements in the subject space and in any comparison space; abatements pertaining to the subject space and to any comparison space (including with respect to base rental, operating expense and/or real estate taxes); inclusion of parking charges in rental, if applicable; lease takeovers/assumptions by the landlord of the comparison space, if applicable; moving allowances granted, if any, in connection with the subject space and with respect to any comparison space; relocation allowances granted, if any, in connection with the subject space and with respect to the comparison space; club memberships granted, if any; construction, refurbishment and repainting allowances granted, if any, in connection with the subject space and with respect to any comparison space; any other concessions or inducements in connection with the subject space and with respect to any comparison space; term or length of lease of subject space and of any comparison space; overall creditworthiness of Tenant and tenants in comparable space; the time the particular rental rate under consideration was agreed upon and became or is to become effective; and payment of a leasing commission, fees, bonuses or other compensation whether to Tenant's representatives or to Landlord, or to any person or entity affiliated with Tenant or Landlord, or otherwise. If Tenant requests improvements or allowance and Landlord agrees to fund such improvements or allowance, the Current Market Rental Rate will be determined factoring Landlord's costs of providing such improvements or allowance. If either Landlord or Tenant fails to designate by written notice to the other its appraiser in the time stated, the one properly appointed shall be empowered to set the then Current Market Rental Value of the Premises. If the two are unable to agree within thirty (30) days after their appointment, they shall appoint a third appraiser, who shall be empowered to choose from the two (2) current market rental values proposed by Landlord's appraiser and the Tenant's appraiser and the one chosen shall be the then Current Market Rental Rate of the Premises. If the two fail to agree on a third appraiser within ten (10) days, then the parties hereto shall request that a third appraiser be appointed by the American Arbitration Association. Such appraiser so appointed shall choose from the two (2) Current Market Rental Rates proposed by Landlord's appraiser and the Tenant's appraiser and the one chosen shall be the then Current Market Rental Rate of the Premises, and the lesser of 95% of such rate or the rate paid during the last year of the Lease Term shall be the rental during the Renewal Period. Notwithstanding anything to the contrary in Section (a), above, if the Current Market Rental Rate has not been fixed within thirty (30) days of the time for exercise of the applicable Renewal Option, the time for exercise of such Renewal Option shall be extended to the date thirty (30) days after the Current Market Rental Rate has been determined. All appraisers must be MAI qualified with at least ten (10) years' experience with commercial space in Louisville, Kentucky. Each party shall bear the costs of its own appraiser; all other costs of the arbitration shall be shared equally between Landlord and Tenant.

**28.3   Expansion Rights.**

(i)      **Expansion Option.** During the first twenty-four (24) months of of the Term, Tenant shall have the on-going right to expand the Premises on one or more occasions (the "Expansion Option") to any portion of the Building except for any portion of floors 14-26 (the "Expansion Space"). Tenant's Expansion Option shall be exercised as follows: at Tenant's request made at any time during the first twenty-four (24) months of the Term, Landlord shall advise Tenant in writing of the availability of the Expansion Space. Tenant shall thereafter have ten (10) business days to exercise its Expansion Option by providing written notice to Landlord (the "Notice of Expansion"), whereupon Landlord shall prepare an amendment to this Lease providing for Tenant's leasing of such portion of the Expansion Space. The amendment shall set forth the terms of lease for the Expansion Space on the same terms and conditions as are set forth in the Lease (to the extent such terms are applicable to the Expansion Space) provided that any agreed upon concessions applicable to the Expansion Space shall be amortized over the remaining period of the Term. The amendment shall be sent to Tenant within thirty (30) days after Landlord's receipt of the Notice of Expansion, and Tenant shall execute and return the amendment to Landlord within ten (10) business days thereafter. The term for the Expansion Space shall commence upon the commencement date stated in the amendment and thereupon such Expansion Space shall be considered a part of the Premises, provided that all of the terms stated in the amendment shall govern Tenant's leasing of the Expansion Space and only to the extent that they do not conflict with the Lease, the terms and conditions of this Lease shall apply to the Expansion Space. If Landlord is delayed delivering possession of the Expansion Space due to the holdover or unlawful possession of such space by any party, Landlord shall use its best efforts to obtain possession of the Expansion Space, and the commencement of the term for the Expansion Space shall be postponed until the date Landlord delivers possession of the Expansion Space to Tenant free from occupancy by any party.

(ii)     **Right of First Offer.** Tenant shall have the on-going right of first offer on one or more occasions (the "Right of First Offer") with respect to the 7th and 8th Floors, and any portion thereof in the Building (the "Offering Space"). Tenant's Right of First Offer shall be exercised as follows: at any time during the first twenty-four (24) months of the Term, after Landlord has determined that the Offering Space has become available (whether due to existing vacancy or due to an existing tenant which has an existing option to renew or extend the term of its lease deciding not renew or extend,) prior to leasing such Offering Space to a party other than the existing tenant, Landlord shall advise Tenant in writing of the availability of the Offering Space. Tenant shall

12

thereafter have ten (10) business days to exercise its Right of First Offer by providing written notice to Landlord (the "Notice of ROFO"), whereupon Landlord shall prepare an amendment to this Lease providing for Tenant's leasing of the Offering Space. The amendment shall set forth the terms of lease for the Offering Space on the same terms and conditions as are set forth in the Lease (to the extent such terms are applicable to the Offering Space) provided that any agreed upon concessions applicable to the Offering Space shall be amortized over the remaining period of the Term. The amendment shall be sent to Tenant within thirty (30) days after Landlord's receipt of the Notice of ROFO, and Tenant shall execute and return the amendment to Landlord within (10) business days thereafter. The term for the Offering Space shall commence upon the commencement date stated in the amendment and thereupon such Offering Space shall be considered a part of the Premises, provided that all of the terms stated in the amendment shall govern Tenant's leasing of the Offering Space and only to the extent that they do not conflict with the Lease, the terms and conditions of this Lease shall apply to the Offering Space. If Landlord is delayed delivering possession of the Offering Space due to the holdover or unlawful possession of such space by any party, Landlord shall use its best efforts to obtain possession of the Offering Space, and the commencement of the term for the Offering Space shall be postponed until the date Landlord delivers possession of the Offering Space to Tenant free from occupancy by any party.

(i.i.i.) **Right of First Refusal**. Tenant shall have the on-going right of first refusal on one or more occasions (the "ROFR") for any space in the Building contiguous to the Premises, including the 12th, 7th and 8th Floors (the "Contiguous Space"). Tenant's Right of First Refusal shall be exercised as follows: if at any time Landlord receives a bona fide written offer from any third party (an "Offer") to lease all or any part of the Contiguous Space, and if Landlord, in good faith, is willing to accept such Offer, then Landlord will promptly provide Tenant with written notice of the terms and conditions of such Offer. Tenant shall thereafter have ten (10) business days to exercise its Right of First Refusal by providing written notice to Landlord (the "Notice of ROFR"), whereupon Landlord shall prepare an amendment to the Lease providing for Tenant's leasing of the Contiguous Space. The amendment shall set forth the terms of lease for the Contiguous Space on the same terms and conditions as are set forth in the Offer except the term shall be coterminous with this Lease (including the Renewal Option); provided, however, if the Offer occurs during the first twenty-four (24) months of the Term, the amendment shall set forth the terms of lease for the Contiguous Space on the same terms and conditions as are set forth in the Lease (as if Tenant had exercised its Right of First Offer). The amendment shall be sent to Tenant within thirty (30) days after Landlord's receipt of the Notice of ROFR, and Tenant shall execute and return the amendment to Landlord within (10) business days thereafter. The term for the Contiguous Space shall commence upon the commencement date stated in the amendment and thereupon such Contiguous Space shall be considered a part of the Premises, provided that all of the terms stated in the amendment shall govern Tenant's leasing of the Contiguous Space and only to the extent that they do not conflict with the Lease, the terms and conditions of this Lease shall apply to the Contiguous Space.

28.4     **Termination Option**. Provided Tenant is not in default of the terms of this Lease beyond any applicable cure period, Tenant shall have the right to terminate this Lease at the end of the month that is the fifty-second (52nd) month after the Commencement Date of the Term for the 10th and 11th Floors upon one hundred eighty (180) days advance written notice to Landlord (the "**Termination Option**"). If the conditions of the Termination Option, as set forth herein, have not been met and Tenant has not exercised the Termination Option on or prior to the expiration of the Termination Option, the Termination Option shall expire and shall cease to be of any further force and effect. If Tenant exercises the Termination Option, Tenant shall be required to pay a fee to Landlord at termination equal to the amount of unamortized real estate commissions paid to brokers under commission agreements plus interest on such amount at 7% annually over the remainder of the Term (the "**Termination Fee**").

28.5     **Parking**. Landlord will use its best efforts to assist Tenant in securing up to three hundred (300) parking spaces (but not less than 200 spaces) within one block of the Building through the City of Louisville Parking Authority or the 4th Street Live Garage. All costs for parking shall be at Tenant's expense.

28.6     **Premises Security Measures**. Tenant shall have the right to install and maintain, at Tenant's sole cost and expense, and subject to Landlord's being provided access to the same, an access card system and video monitoring system for the Premises including stairwells for intra-office use.

28.7     **Secured Telecommunications Equipment**. Subject to Landlord's approval of the location and size thereof, Tenant will have the right to construct a secure caged area within the Building's demarcation room for Tenant's telecommunications equipment. Any such space shall be constructed at Tenant's sole cost and expense; provided, however, that Tenant will not be charged any Rent in connection therewith. In addition, Tenant shall have the right, at no additional cost to Tenant, to use the Building's risers and/or chases for the installation of a Tenant dedicated conduit in connection with such telecommunications equipment

28.8     **Measurement**. Landlord represents and warrants that all measurements that affect this Lease, including without limitation measurements of the Building, Premises, or other buildings in the Complex, have been measured in accordance with the Building Owners and Managers Association ("BOMA") Standard Method for Measuring Floor Space in Office Buildings ANSI/BOMA Z65.1 (2010).

28.9     **Compliance with Laws**. During the Term, Landlord shall be responsible for making any modifications to the Building and Complex required pursuant to any federal, state or local laws, ordinances, building codes, and rules and regulations of governmental entities having jurisdiction over the Complex, including but not limited to the applicable fire code and the Americans with Disabilities Act, as amended ("ADA") and all regulations and orders promulgated pursuant to the ADA (collectively, "Applicable Laws"). Landlord represents and warrants that, to Landlord's knowledge, as of the Commencement Date, the Building and Complex are in full compliance with all federal, state, and local laws, ordinances, building codes, and rules and regulations of governmental entities having jurisdictions over the Building and Complex or any portion thereof.

28.10     **Hazardous Materials**. To Landlord's actual knowledge, there are no hazardous materials, as defined in the Federal Clean Air Act, the Federal Water Pollution Control Act, the Comprehensive Environmental Response, Compensation, and Liability Act 1980, or any other similar environmental laws, as from time to time

13

amended (all hereafter collectively called "Environmental Laws"), located within, on or under the Building, except in accordance with Environmental Laws.

28.11    **Freight Elevator and Fire Stairs.**  Tenant shall be allowed to use, at no cost to Tenant, the freight elevator and the fire stairs during Building Operating Hours for the construction of the Tenant Improvements and for all reasonable and necessary uses prior to the Commencement Date including move-in and move-out.  For any use of the freight elevator or fire stairs after Building Operating Hours or for continual periods of time, Tenant must schedule such uses thereof with Building property management provided Tenant's use shall be at no cost to Tenant.

28.12    **Restoration of Premises upon Lease Termination.**  With the exception of cabling, Tenant shall not be required to remove the Tenant Improvements from the Premises or the LAN room(s) and associated fixtures upon Lease Termination.

28.13    **HVAC and Electric.**  HVAC and electric services shall be available to the Premises at all times.  The Landlord's actual cost of providing HVAC and electric to Tenant with regard to the Premises shall be invoiced to Tenant monthly for Tenant's usage.  Tenant shall be permitted, at its sole cost and expense and in accordance with the Work Letter, to install supplemental HVAC units and flex duct work in the area above ceiling tiles in the Premises.

28.14.    **Stairwells for Intra-Office Access.**  Tenant is entitled to use the stairwells between the floors of the Premises for intra-office access.

28.15    **Landlord Security Obligations.**  Landlord's obligations to provide security under the Lease include the following measures:  the Complex is monitored via a 24/7 staffed control center.  Lobby personnel monitor the main lobby through concierge and security staff from 8am to 9pm Monday through Friday, and security patrols the Complex Saturday and Sunday.  Access to each floor, as well as the Building during after-hours and weekends is via a monitored access card system.  Stairwell doors at each floor are monitored to alert the control center of any entry.  Roof access is monitored at all times.  Onsite security is available by the Landlord for evening escorting to parking.

28.16    **Landlord Insurance.**  Landlord will at all times carry insurance on the Building and Complex equal in amount to its full replacement cost and liability insurance in such amounts as are then being carried by landlords of comparable buildings.  Upon request, Landlord will provide evidence of such insurance in the form of a current, valid acord certificate.

28.17    **Capital Improvements.**  Landlord is expected to deliver renovations to the main lobby during the first quarter of 2015.  Prior to the Commencement Date, Landlord shall also convert the HVAC system from pneumatic controls to DDCs so as to damper off each floor of the Premises.  Tenant shall not be charged any portion of the cost of such renovation or HVAC system conversion.

**REMAINDER OF PAGE LEFT BLANK.  SIGNATURE PAGE FOLLOWS.**

EXECUTED as of the date and year above first written.

**TENANT:**

COMPUTERSHARE, INC.

By: _Frank Madonna_

Name: FRANK MADONNA

Title: 11/6/14

**LANDLORD:**

DOF IV MEIDINGER TOWER, LLC

By: _____

Name: Bill Stasiulatis

Title: Authorized Signatory

[1248536/1]      15

**EXHIBIT INDEX**

| | |
|---|---|
| Exhibit A: | Glossary |
| Exhibit B: | Depiction of Premises |
| Exhibit C: | Rules and Regulations |
| Exhibit D: | Work Letter |
| Exhibit E: | Property Legal Description |

EXHIBIT A

GLOSSARY OF DEFINED TERMS

1.     "**Addendum**" shall mean the Addendum, if any, attached to this Lease.

2.     "**Affiliate**" shall mean a person or party who or which controls, is controlled by or is under common control with another person or party.

3.     "**Building**" shall mean that certain office building constructed on the Land, the street address of which is 462 South Fourth Avenue, Louisville, Kentucky. The term "Building" shall include all fixtures and appurtenances in and to the aforesaid structure, including specifically but without limitation all above grade walkways and all electrical, mechanical, plumbing, security, elevator, boiler, HVAC, telephone, water, gas, storm sewer, sanitary sewer and all other utility systems and connections, all life support systems, sprinklers, smoke detection and other fire protection systems, and all equipment, machinery, shafts, flues, piping, wiring, ducts, duct work, panels, instrumentation and other appurtenances relating thereto.

4.     "**Building Operating Hours**" shall mean 7:00 a.m. to 6:00 p.m. Monday through Friday and Saturday 8:00 a.m. to 1:00 p.m., exclusive of Sundays and Holidays.

5.     "**Building Rules and Regulations**" shall mean the rules and regulations governing the Complex promulgated by Landlord from time to time. The current Building Rules and Regulations maintained by Landlord are attached as Exhibit C hereto. *In the event of a conflict between the Rules & Regulations found in Exhibit C attached hereto and the Lease, the Lease shall dominate.*

6.     "**Building Standard**", when applied to an item, shall mean such item as has been designated by Landlord (orally or in writing) as generally applicable throughout the leased portions of the Building.

7.     "**Commencement Date**" shall mean the date of the commencement of the Term as determined pursuant to Section 6.3.

8.     "**Common Areas**" shall mean all areas and facilities within the Complex which have been constructed and are being maintained by Landlord for the common, general, non-exclusive use of all tenants in the Building, and shall include the conference center, collaboration room, fitness center, restrooms, lobbies, corridors, service areas, elevators, stairs and stairwells, driveways, loading areas, ramps, walkways and landscaped areas.

9.     "**Complex**" shall mean the Land and all improvements thereon, including the Building.

10.    "**Fiscal Year**" shall mean the fiscal year (or portion thereof) of Landlord as elapses during the Term. The Fiscal Year currently commences on January 1; however, Landlord may change the Fiscal Year at any time or times.

11.    "**Force Majeure**" Neither party shall be in default to the extent that any of the following delays its performance or makes its performance impossible or commercially impracticable ("Force Majeure"): act of God, war, act of terrorism, civil commotion, governmental action, fire, storm, flood, explosion, or the like *provided that* such act or event (1) prohibits the affected party's performance of its obligations under this Lease, (2) is beyond the reasonable control of the affected party and not due to its own fault or negligence, and (3) could not have been prevented or avoided by the affected party through the exercise of due diligence, including the expenditure of any reasonable sum.

12.    "**Holidays**" shall mean (a) New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day and Christmas Day, (b) other days on which national or state banks located in the state where the Complex is located must or may close for ordinary operations and (c) other days which are commonly observed as holidays by the majority of tenants of the Building. If the Holiday occurs on a Saturday or Sunday, the Friday preceding or the Monday following may, at Landlord's discretion, be observed as a Holiday.

13.    "**HVAC**" shall mean the heating, ventilation and air conditioning systems in the Building.

14.    "**Impositions**" shall mean, during the Term of the Lease, (a) all real estate, personal property, rental, water, sewer, transit, use, occupancy and other taxes, assessments, charges, excises and levies (including any interest, costs or penalties with respect thereto), general and special, ordinary and extraordinary, foreseen and unforeseen of any kind and nature whatsoever which are assessed, levied, charged or imposed upon or with respect to the Complex, or any portion thereof, or the sidewalks, streets or alley ways adjacent thereto, or the ownership, use, occupancy or enjoyment thereof (including but not limited to mortgage taxes and other taxes and assessments passed on to Landlord by Landlord's Mortgagee) and (b) all charges for any easement, license, permit or agreement maintained for the benefit of the Complex. "Impositions" shall not include income taxes, estate and inheritance taxes, excess profit taxes, franchise taxes, taxes imposed on or measured by the income of Landlord from the operation of the Complex, and taxes imposed on account of the transfer of ownership of the Complex or the Land. If any or all of the Impositions be discontinued and, in substitution therefor, taxes, assessments, charges, excises or impositions be assessed, levied, charged or imposed wholly or partially on the Rents received or payable hereunder (a "**Substitute Imposition**"), then the Substitute Imposition shall be deemed to be included within the term "Impositions". Notwithstanding the foregoing, Landlord shall pay such Impositions and Substitute Impositions at such time to achieve the maximum discount available and in the manner prescribed and adjust the Operating Expenses to account for any discounts for on-time payments.

15.    **Intentionally left blank.**

16.    "**Land**" shall mean the real property on which the Building is constructed and which is further described in Exhibit E hereto.

17

17.     "**Landlord's Mortgagee**" shall mean the mortgagee of any mortgage, the beneficiary of any deed of trust, the pledgee of any pledge, the secured party of any security interest, the assignee of any assignment and the transferee of any other instrument of transfer (including the ground lessor of any ground lease on the Land) now or hereafter in existence on all or any portion of the Complex, and their successors, assigns and purchasers. "**Mortgage**" shall mean any such mortgage, deed of trust, pledge, security agreement, assignment or transfer instrument, including all renewals, extensions and rearrangements thereof and of all debts secured thereby.

18.     "**Landlord's Work**" shall mean all improvements, components, assemblies, installations, finish, labor, materials and services that Landlord is required to furnish, install, perform, provide or apply to the Premises as specified in the Work Letter.

19.     **Reserved.**

20.     "**Legal Requirements**" shall mean any and all (a) judicial decisions, orders, injunctions, writs, statutes, rulings, rules, regulations, promulgations, directives, permits, certificates or ordinances of any governmental authority in any way applicable to Tenant or the Complex, including but not limited to the Building Rules and Regulations, zoning, environmental and utility conservation matters, (b) requirements imposed on Landlord by any Landlord's Mortgagee, (c) insurance requirements and (d) other documents, instruments or agreements (written or oral) relating to the Complex or to which the Complex may be bound or encumbered.

21.     "**Net Rentable Area**" whether of the Premises or the Complex shall mean the area determined pursuant to the American National Standard Method for measuring floor space in office buildings, as set forth in American National Standard's Institute publication Z65.1-1980 and as, from time to time, revised. Landlord and Tenant hereby stipulate that, unless and until revised by virtue of the application of the standards set forth in said publication or in a revised publication, the Net Rentable Area of the Premises shall be 27,960 square feet on the 10th and 11th Floors and 13,980 square feet on the 9th Floor and the Net Rentable Area of the Building shall be 331,054 square feet.

22.     "**Operating Expenses**" shall mean all reasonable and customary costs and expenses which Landlord pays or accrues by virtue of the ownership, use, management, leasing, maintenance, service, operation, insurance or condition of the Complex during a particular Fiscal Year or portion thereof as determined by Landlord or its certified public accountants in accordance with generally accepted accounting principles plus (in instances where the Building was not fully occupied for the entire period in question) all additional variable costs and expenses which Landlord or such accountant reasonably determines Landlord would have paid or accrued during such period if the Building has been fully occupied (defined as 95% occupied). "Operating Expenses" shall include, but shall not be limited to, the following to the extent they relate to the Complex:

(a)     all Impositions and other governmental charges above those incurred in calendar year 2015;

(b)     all insurance premiums charged for policies obtained by Landlord, which may include without limitation, at Landlord's election, (i) fire and extended coverage insurance including earthquake, windstorm, hail, explosion, riot, strike, civil commotion, aircraft, vehicle and smoke insurance, (ii) public liability and property damage insurance, (iii) elevator insurance, (iv) workmen's compensation insurance for the employees covered by clause (h), (v) boiler, machinery, sprinkler, water damage, legal liability, burglary, hold-up, fidelity and pilferage insurance, (vi) rental loss insurance and (vii) such other insurance as Landlord may elect to obtain;

(c)     all deductible amounts incurred in any Fiscal Year relating to an insurable loss;

(d)     all maintenance, repair, replacement and painting costs;

(e)     all janitorial, custodial, cleaning, washing, landscaping, landscape maintenance, trash removal and pest control costs;

(f)     all security costs;

(g)     all electrical, energy monitoring, water, water treatment, gas, sewer, telephone and other utility and utility related charges; provide however that electric and HVAC serving the Premises shall be submetered in accordance with the Building Standards.

(h)     all wages, salaries, salary burdens, employee benefits, payroll taxes, social security and insurance for all persons engaged by Landlord or an Affiliate of Landlord or the property management company engaged by Landlord or affiliates of the Property management company engaged by Landlord;

(i)     all costs of leasing or purchasing supplies, tools, equipment and materials;

(j)     all management fees and other charges for management services (including, without limitation, travel and related expenses), whether provided by an independent management company, by Landlord or by an Affiliate of Landlord not to exceed 3%;

(k)     all fees and other charges paid under all maintenance and service agreements, including but not limited to window cleaning, elevator and HVAC maintenance;

(l)     all legal, accounting and auditing fees and expenses; and

(m)     amortization of the cost of acquiring, financing and installing capital items which are intended to reduce (or avoid increases in) operating expenses but only to the extent of actual savings in any one year. Such costs shall be amortized over the reasonable life of the items in accordance with generally accepted accounting principles, but not beyond the reasonable life of the Building.

18

"Operating Expenses" shall be offset by any savings benefitting the Complex in the Landlord's exercise of best management practices.

"Operating Expenses" shall not include:

(i)     expenditures classified as capital expenditures for federal income tax purposes except as set forth in clause (m) above;

(ii)    costs for which Landlord is entitled to specific reimbursement by Tenant, by any other tenant of the Building or by any other third party;

(iii)   allowances specified in any Work Letter for expenses incurred by Landlord for improvements to any premises;

(iv)   leasing commissions, and all non-cash expenses (including depreciation);

(v)    land or ground rent, if applicable;

(vi)   depreciation on the Building or on any personal property, equipment, window coverings on exterior windows provided by Landlord, or carpeting in public corridors and Common Areas;

(vii)  cost of alterations of space or other improvements made for tenants of the Building;

(viii) marketing expenses, finders' fees, real estate brokers' commissions, or any cost or expense (included without limitation cost of any inducements provided to tenants, tenant finish allowances, and moving expenses) incurred in connection with the sale, leasing or attempted sale of the Building or any part thereof;

(ix)   fees for professional services including legal, engineering, accounting, appraisal that (a) are not directly related to the management, operation, repair and maintenance of the Building, or (b) are related to the sale or attempted sale of the Building or any part thereof; or (c) for leases.

(x)    ground lease payments, mortgage principal, interest or charges commonly referred to as "points" or any other loan charges and fees in connection with any financing or refinancing associated with the Building, the land it is located on or with respect to all or any part of either;

(xi)   costs of replacements to personal property and equipment which are or should be capitalized;

(xii)  costs of any services provided to any tenant in the Building that are billed directly to such tenants;

(xiii) the cost of repairs due to casualty or condemnation that are reimbursed by third parties;

(xiv) any cost due to Landlord for breach of this Lease or any other lease;

(xv)  any income, estate, inheritance, or other transfer tax and any excess profit, franchise, or similar taxes on Landlord's business;

(xvi) cost of alterations, maintenance, or repair of any item attributable solely to a specific tenant above base building standard items or services;

(xvii) any payments for air rights, licenses or easements benefiting the Building;

(xviii) costs (including permits, licenses, and inspection costs) incurred with respect to the installation of tenant improvements for tenants in the Building or incurred in renovating, decorating, painting or redecorating vacant space for tenants;

(xix) utilities for which any occupant of the Building directly contracts with the utility company or which is separately metered, and other costs which any occupant pays directly to the utility company or other vendor;

(xx)  expenses paid to affiliates of Landlord, or to the Building's manager or its affiliates, to the extent the same exceed expenses that would be incurred in an arm's-length transaction;

(xxi) debt service on any indebtedness secured by the Complex;.

(xxii) costs and expenses of electric and HVAC service to the Premises or any other premises separately metered;

(xxiii) signage;

(xxiv) reserved;

(xxiv) reserved;

(xxv) costs associated with hazardous materials;

(xxvi) costs to correct latent defects;

19

(xxvii)   art work;

(xxviii)   political and charitable contributions; and

(xxix)   other costs not in accordance with generally acceptable accounting principles.

In no event shall Landlord recover more than the amount(s) Landlord has actually paid in Operating Expenses.

The term "Controllable Operating Expenses" shall mean all of the foregoing Operating Expenses, with the exception of items (a), (b) and (g).  Controllable Operating Expenses shall be capped at 5%.

23.        "**Premises**" shall mean the area leased by Tenant pursuant to this Lease as outlined on the floor plan drawing attached as Exhibit B hereto and all other space added to the Premises pursuant to the terms of this Lease. The Premises includes the space between the top surface of the floor slab of the outlined area and the finished surface of the ceiling immediately above.

24.        "**Rent**" shall mean Base Rent, Additional Rent and all other amounts provided for under this Lease to be paid by Tenant, whether as additional rent or otherwise.  "**Base Rent**" shall mean the base rent specified in Section 5.1.  "**Additional Rent**" shall mean the additional rent specified in Section 5.2.

25.        "**Taking**" or "**Taken**" shall mean the actual or constructive condemnation, or the actual or constructive acquisition by or under threat of condemnation, eminent domain or similar proceeding, by or at the direction of any governmental authority or agency.

26.        "**Tenant's Share**" shall mean the proportion by which the Net Rentable Area of the Premises bears to the Net Rentable Area of the Building.  "Tenant's Share" shall be adjusted by Landlord from time to time to reflect adjustments to the then current Net Rentable Area of the Building or the Premises.  "Tenant's Share" shall initially mean 27,960 square feet on the 10th and 11th Floors ÷ 331,054 rentable square feet x 100 = 8.45% and 13,980 square feet on the 9th Floor rentable square feet ÷ 331,054 rentable square feet x 100 = 4.22%.

27.        "**Transfer**" shall have the meaning ascribed to it in Section 10.

28.        "**Tenant Related Party**" shall have the meaning ascribed to it in Section 10.

29.        "**Work Letter**" shall mean the agreement, if any, attached as Exhibit D hereto between Landlord and Tenant for the construction of improvements in the Premises.

EXHIBIT B

PREMISES



9th Floor Core/Shell Plan          1" = 20'-0"

Meidinger Tower
462 South Fourth Street - Louisville, KY

12/14/2004
MTO-A1-09

21



South Fourth Street

Muhammad Ali Boulevard

NORTH

10th Floor Core/Shell Plan

1" = 20'-0"

Meidinger Tower
462 South Fourth Street  -  Louisville, KY

12/14/2004
MTO-A1-10

22



11th Floor Core/Shell Plan

1" = 20'-0"

EXHIBIT C

RULES AND REGULATIONS

1.    Landlord may from time to time adopt appropriate systems and procedures for the security or safety of the Building, any persons occupying, using, or entering the Building, or any equipment, finishings, or contents of the Building, and each tenant shall comply with such systems and procedures.

2.    Tenant's employees, visitors, and licensees shall not loiter in or interfere with the Complex's driveway nor consume alcohol in the common areas of the Complex.  The sidewalks, halls, passages, exits, entrances, elevators, escalators, and stairways of the Building will not be obstructed by any tenants or used by any of them for any purpose other than for ingress to and egress from their respective premises.  The halls, passages, exits, entrances, elevators, escalators, and stairways are not for the general public, and Landlord may control and prevent access to them by all persons whose presence, in the reasonable judgment of Landlord, would be prejudicial to the safety, character, reputation and interests of the Building and its tenants; in determining whether access will be denied, Landlord may consider attire worn by a person and its appropriateness for an office building, whether shoes are being worn, use of profanity, either verbally or on clothing, actions of a person (including, without limitation, spitting, verbal abusiveness, and the like), and such other matters as Landlord may reasonably consider appropriate.

3.    No sign, placard, picture, name, advertisement, or notice visible from the exterior of any tenant's premises shall be inscribed, painted, affixed, or otherwise displayed by any tenant on any part of the Building without the prior written consent of Landlord.  All approved signs or lettering on doors will be printed, painted, affixed, or inscribed at the expense of the tenant desiring such by a person approved by Landlord.  Material visible from outside the Building will not be permitted.  Landlord may remove such material without any liability, and may charge the expense incurred by such removal to the tenant in question.

4.    No curtains, draperies, blinds, shutters, shades, screens, or other coverings, hangings, or decorations will be attached to, hung, or placed in, or used in connection with any window of the Building or the Premises.

5.    The sashes, sash doors, skylights, windows, heating, ventilating, and air conditioning vents and doors that reflect or admit light and air into the halls, passageways, or other public places in the Building shall not be covered or obstructed by any tenant, nor will any bottles, parcels, or other articles be placed on any window sills.

6.    ˙ No showcases or other articles will be put in front of or affixed to any part of the exterior of the Building, nor placed in the public halls, corridors, or vestibules without the prior written consent of Landlord.

7.    No tenant will permit its premises to be used for lodging or sleeping.  No cooking will be done or permitted by any tenant on its premises, except in areas of the premises which are specially constructed for cooking, so long as such use is in accordance with all applicable federal, state, and city laws, codes, ordinances, rules, and regulations.

8.    No tenant will employ any person or persons other than the cleaning service of Landlord for the purpose of cleaning the premises, unless otherwise agreed by Landlord in writing.  If any tenant's actions result in any increased expense for any required cleaning, Landlord may assess such tenant for such expenses.  Janitorial service will not be furnished on nights to offices which are occupied after Building Operating Hours on those nights unless, by prior written agreement of Landlord, service is extended to a later hour for specifically designated offices.

9.    The toilets, urinals, wash bowls, and other plumbing fixtures will not be used for any purposes other than those for which they were constructed, and no sweepings, rubbish, rags, or other foreign substances will be thrown in them.  All damages resulting from any misuse of the fixtures will be borne by the tenant who, or whose servants, employees, agents, visitors, or licensees, have caused the damage.

10.    No tenant will deface any part of the premises or the Building.  Without the prior written consent of Landlord, no tenant will lay linoleum, or other similar floor covering, so that it comes in direct contact with the floor of such tenant's premises.  If linoleum or other similar floor covering is to be used, an interlining of builder's deadening felt will be first affixed to the floor, by a paste or other material, soluble in water.  The use of cement or other similar adhesive material is expressly prohibited.

11.    No tenant will alter, change, replace, or rekey any lock or install a new lock or a knocker on any door of the premises.  Landlord, its agent or employee, will retain a master key to all door locks on the premises.  Any new door locks required by a tenant or any change in keying of existing locks will be installed or changed by Landlord following such tenant's written request to Landlord and will be at such tenant's expense.  All new locks and rekeyed locks will remain operable by Landlord's master key.  Landlord will furnish to each tenant, free of charge, two (2) keys to each door lock on its premises.  Landlord will have the right to collect a reasonable charge for additional keys and cards requested by any tenant.  Each tenant, upon termination of its tenancy, will deliver to Landlord all keys and access cards for the premises and Building which have been furnished to such tenant.

12.    ˙ The elevator designated for freight by Landlord will be available for use by all tenants in the Building during Building Operating Hours and pursuant to such procedures as Landlord may determine from time to time.  The persons employed to move tenant's equipment, material, furniture, or other property in or out of the Building must be acceptable to Landlord; such persons must be a locally recognized professional mover, whose primary business is the performing of relocation services, and must be bonded and fully insured.  A certificate or other verification of such insurance must be received and approved by Landlord prior to the start of any moving operations.  Insurance must be sufficient, in Landlord's sole opinion, to cover all personal liability, theft, or damage to the Building, including without limitation floor coverings, doors, walls, elevators, stairs, foliage, and landscaping.  All moving operations will be conducted at such times and in such a manner as Landlord may direct, and all moving will take place during nonbusiness hours unless Landlord otherwise agrees in writing.  The moving tenant shall be responsible for the provision of Building security during all moving operations, and shall be liable for all losses and damages sustained by any party as a result of the failure to supply adequate security.  Landlord may prescribe the weight, size, and position of all equipment, materials, furniture, or other property brought into

24

the Building. Heavy objects will, if considered necessary by Landlord, stand on wood strips of such thickness as is necessary to distribute the weight properly. Landlord will not be responsible for loss of or damage to any such property from any cause, and all damage done to the Building by moving or maintaining such property will be repaired at the expense of the moving tenant. Landlord may inspect all such property to be brought into the Building and to exclude from the Building all such property which violates any of these rules and regulations or the lease of which these rules and regulations are a part. Supplies, goods, materials, packages, furniture, and all other items of every kind delivered to or taken from the premises will be delivered or removed through the entrance and route designated by Landlord.

13.     No tenant will use or keep in the premises or the Building any kerosene, gasoline, or inflammable or combustible or explosive fluid or material or chemical substance other than limited quantities of them reasonably necessary for the operation or maintenance of office equipment or limited quantities of cleaning fluids and solvents required in normal operation of the premises. Without Landlord's prior written approval, no tenant will use any method of heating or air conditioning other than that supplied by Landlord. No tenant will keep any firearms within the Premises. No tenant will use or keep or permit to be used or kept any foul or noxious gas or substance in the premises, or permit of suffer the premises to be occupied or used in an manner offensive or objectionable to Landlord or other occupants of the Building by reason of noise, odors, or vibrations, or interfere in any way with other tenants or those having business in the Building.

14.     Landlord may without notice and without liability to any tenant, change the name and street address of the Building.

15.     Landlord will have the right to prohibit any advertising by tenant, mentioning the Building, which, in Landlord's reasonable opinion, tends to impair the reputation of the Building or its desirability as a Building for offices, and upon written notice from Landlord, tenant will discontinue such advertising.

16.     Tenant will not bring any animals or birds into the Building, and will not permit bicycles or other vehicles inside or on the sidewalks outside the Building except in areas designated from time to time by Landlord for such purposes.

17.     All persons entering or leaving the Building at any time other than during Building Operating Hours shall comply with such off-hour regulations as Landlord may establish and modify from time to time. Landlord may limit or restrict access to the Building during such periods.

18.     Each tenant will store all its trash and garbage within its premises. No material will be placed in the trash boxes or receptacles if such material is of such nature that it may not be disposed of in the ordinary and customary manner of removing and disposing of trash and garbage without being in violation of any law or ordinance governing such disposal. All garbage and refuse disposal will be made only through entryways and elevators provided for such purposes and at such times as Landlord may designate. No furniture, appliances, equipment, or flammable products of any type may be disposed of in the Building trash receptacles.

19.     Canvassing, peddling, soliciting, and distribution of handbills or any other written materials in the Building are prohibited, and each tenant will cooperate to prevent same.

20.     Each tenant shall keep the doors of the premises closed and locked and shall shut off all water faucets, water apparatus, and utilities before tenant or tenant's employees leave the premises, so as to prevent waste or damage, and for any default or carelessness in this regard tenant shall be liable for all injuries sustained by other tenants or occupants of the Building or Landlord. On multiple-tenancy floors, all tenants will keep the doors to the Building corridors closed at all times except for ingress and egress.

21.     Smoking will not be permitted in hallways, stairwells, elevators or rest rooms. Smoking will not be permitted in front of any entrance to the Building. Tenants will be allowed to smoke in their respective suites, as long as the Tenant has properly vented the area in which the Tenant smokes. If the smoke from a Tenant's suite commingles with the air of a different Tenant, it is then the responsibility of the Tenant that smokes to correct the problem, or the Landlord will ban the Tenant from smoking in that suite.

EXHIBIT D

WORK LETTER

This Work Letter is intended to set forth the obligations of Landlord and Tenant with respect to the preparation of the Premises for Tenant's occupancy.

## A. DELIVERY OF PREMISES IN SHELL CONDITION

1.      At Landlord's sole cost and expense, the 10th and 11th Floors shall be delivered to Tenant in shell condition not later than December 1, 2014; the 9th Floor shall be delivered to Tenant in shell condition not later than December 1, 2015.  The term "shell condition" means that the Premises shall be in compliance with the Legal Requirements, vacant, broom clean condition, ceilings in place, lighting in place (retrofitted to LG&E energy efficient standard), and all floor coverings, walls, wiring and any other obstructions shall be removed by Landlord prior to such delivery including demolition of existing conditions as may be directed by Tenant's architect.

2.      Without limiting the foregoing, Landlord shall perform, at the Landlord's sole cost and expense and in compliance with the Legal Requirements, the following Landlord's Work items:

    a.      Refurbishment (including installation of touch-free faucets and auto-urinals) in all bathrooms servicing the Premises in compliance with the applicable provisions of the Americans with Disabilities Act of 1992;

    b.      Sprinkler infrastructure  in place, including combination standpipe/sprinkler risers, pumps, valve connections, and main sprinkler loop on each floor of the Premises which is fully operational, code compliant and ready for Tenant branch piping and sprinkler head installation;

    c.      The main HVAC trunk  complete and in place with smoke and fire dampers at the core on each floor of the Premises;

    d.      All Building systems brought to the Premises and fully operational in accordance with the agreed-upon specifications;

    e.      Fireproofing and enclosure of any exposed structural steel;

    f.      Delivery of the Premises in shell condition;

    g.      Delivery of the Premises free of all environmentally hazardous materials, including insulation on steam pipes, piping with columns, within and under floor distribution system, and Landlord shall provide an ACP-5 notification form for all portions of the Premises;

    h.      Scraping, and patching and leveling of all floors;

    i.      Patch/repair tape, spackle, and sand all perimeter and core walls and all column enclosures and deliver sheetrocked and ready to receive Tenant's finishes; and

    j.      Available connection points on each floor of Tenant's strobes and related Class E connections. Landlord, at its expense, shall provide all points, tie-ins, and software reprogramming.  Tenant to determine its requirements relative to the existing Class E system.  All fire and safety systems, including alarms, speakers, communications, shall be in full service and available on all floors of the Premises.  Landlord shall also install strobes in the core lavatories.

## B. CONSTRUCTION OF TENANT IMPROVEMENTS

1.      **Tenant Improvements.**  All improvements described in this Work Letter to be constructed in and upon the Premises, including the Building Standard restrooms, are hereinafter referred to as the "Tenant Improvements." It is agreed that construction of the Tenant Improvements will be completed in accordance with the procedures set forth in this Work Letter.

2.      **Tenant's Initial Plans; the Work.**  Tenant desires Landlord to perform certain leasehold improvement work in the Premises in substantial accordance with the attached plan or plans (collectively, the "Initial Plan") prepared by Nelson & Associates Interior Design and Space Planning, Inc. dated September 23, 2014 and the Project Plan dated October 28, 2014.  Such work, as shown in the Initial Plan and as more fully detailed in the Working Drawings (as defined and described in Paragraph 4 below), shall be hereinafter referred to as the "Work". If Landlord is able to complete any phase of the Project Plan (e.g., permitting) sooner than scheduled, such time savings shall change the subsequent dates on such Project Plan accordingly.  All plans, drawings, specifications and other details describing the Work which have been or are hereafter furnished by or on behalf of Tenant shall be subject to Landlord's approval, which Landlord agrees shall not be unreasonably withheld.  Neither the approval by Landlord of the Work or Initial Plan or any other plans, drawings, specifications or other items associated with the Work nor Landlord's performance, supervision or monitoring of the Work shall constitute any warranty by Landlord to Tenant of the adequacy of the design for Tenant's intended use of the Premises.

3.      **Tenant Responsibilities.**  Space planning and construction drawings shall be prepared by Tenant's architect and paid by Tenant. Tenant shall furthermore be responsible for the design, function and maintenance of all special improvements, whether installed by Landlord at Tenant's request or installed by Tenant with Landlord's prior written approval.  Tenant shall use the Building Standard materials unless other materials are expressly approved in writing by Landlord. All drawings shall be reviewed and approved by Landlord prior to construction. Landlord's approval shall not be unreasonably withheld. It is agreed that construction of the Tenant Improvements will be completed at Tenant's sole cost and expense, which includes Landlord's construction  management fee

26

equal to two percent (2%) of the construction costs (hard costs only). Such construction management fee shall not apply for any Tenant Improvements made by Tenant at Tenant's expense after Tenant's initial occupancy of the Premises. Tenant shall have the right to identify preferred general contractors and subcontractors and Tenant shall be consulted by Landlord prior to Landlord's selection of the general contractor and the subcontractors. Landlord shall enter into a direct contract for the Tenant Improvements with a general contractor and subcontractors selected by Landlord and Tenant. Landlord shall furnish Tenant with a copy of such contract when executed.

4.    **Working Drawings.** If necessary for the performance of the Work and not included as part of the Initial Plan attached hereto, Tenant shall prepare or cause to be prepared final working drawings and specifications for the Work (the "Working Drawings") based on and consistent with the Initial Plan and the other plans, drawings, specifications, finish details and other information furnished by Tenant to Landlord and approved by Landlord pursuant to Paragraph 2 above. So long as the Working Drawings are consistent with the Initial Plan, Landlord shall approve the Working Drawings within three (3) business days after receipt of same from Tenant by initialing and returning to Tenant each sheet of the Working Drawings.

5.    **Tenant Changes.** If Tenant shall request any change, addition, deletion or alteration to the Plans (a "**Tenant Change Order**"), Tenant shall have the Plans revised if necessary. Promptly upon completion of the revisions to the Plans, Landlord shall notify Tenant in writing of the cost associated with accomplishing the Tenant Change Order. Tenant shall, within three (3) Business Days, notify Landlord in writing whether it desires to proceed with such Tenant Change Order. In the absence of such written authorization, Landlord shall have the option to continue work on the Premises disregarding the requested Tenant Change Order, or Landlord may elect to discontinue work on the Premises. Landlord and Tenant agree that any postponement of Tenant's occupancy of the Premises caused by Tenant's request to revise the Plans or by any such Tenant Change Order shall not result in an abatement of Rent. In the event such Tenant Change Order results in a higher estimate of the cost of construction and/or higher actual construction costs such increased estimate or costs shall be deemed "Excess Costs" and Tenant shall pay such Excess Costs.

6.    **Performance of the Work.** Except as hereinafter provided to the contrary, Landlord shall cause the performance of the Work using (except as may be stated or shown otherwise in the Working Drawings) building standard materials, quantities and procedures then in use by Landlord ("Building Standards"). Tenant shall pay for the entire Cost of the Work. The term "Cost of the Work" shall mean and include any and all fees, costs and expenses of the Work, including, without limitation, the cost of the Working Drawings and of all labor (including overtime) and materials constituting the Work.

7.    **Payment.** Prior to commencing the Work, Landlord shall submit to Tenant a written statement of the total Cost of the Work (which shall include the amount of any overtime projected as necessary to substantially complete the Work by the Commencement Date specified in the Lease) as then known by Landlord. Tenant agrees, within three (3) business days after submission to it of such statement, to execute and deliver to Landlord, in the form then in use by Landlord, an authorization to proceed with the Work. No Work shall be commenced until Tenant has fully complied with the preceding provisions of this Paragraph 7. In the event, and each time, that any change order by Tenant, unknown field condition, delay caused by acts beyond Landlord's control or other event or circumstance causes the Cost of the Work to be increased after the time that Landlord delivers to Tenant the aforesaid initial statement of the Cost of the Work, Landlord shall deliver to Tenant a revised statement of the total Cost of the Work. Tenant shall pay for the Cost of the Work on a monthly basis in accordance with draw requests submitted by Landlord's contractor and approved by Tenant's architect.

8.    **Substantial Completion.** Landlord shall cause the Work to be "substantially completed" on or before the scheduled date of commencement of the term of the Lease, subject to delays caused by strikes, lockouts, boycotts or other labor problems, casualties, discontinuance of any utility or other service required for performance of the Work, unavailability or shortages of materials or other problems in obtaining materials necessary for performance of the Work or any other matter beyond the control of Landlord (or beyond the control of Landlord's contractors or subcontractors performing the Work) and also subject to "Tenant Delays" (as defined and described in Paragraph 9 of this Work Letter). The Work shall be deemed to be "substantially completed" for all purposes under this Work Letter and the Lease if and when Landlord issues a written certificate to Tenant, certifying that the Work has been substantially completed (i.e., completed except for "punchlist" items listed in such certificate) in substantial compliance with the Working Drawings, or when Tenant first takes occupancy of the Premises, whichever first occurs. If the Work is not deemed to be substantially completed on or before the scheduled date of the commencement of the term of the Lease as specified in the Lease, (a) Landlord agrees to use reasonable efforts to complete the Work as soon as practicable thereafter, (b) the Lease shall remain in full force and effect, (c) Landlord shall not be deemed to be in breach or default of the Lease or this Work Letter as a result thereof and Landlord shall have no liability to Tenant as a result of any delay in occupancy (whether for damages, abatement of Rent or otherwise except as provided in Section 6.3 of the Lease), and (d) except in the event of Tenant Delays, and notwithstanding anything contained in the Lease to the contrary, the Commencement Date of the Lease Term shall be extended to the date on which the Work is deemed to be substantially completed and the Expiration Date of the Lease Term as specified in the Lease shall be extended by an equal number of days. At the request of either Landlord or Tenant in the event of such extensions in the commencement and expiration dates of the term of the Lease, Tenant and Landlord shall execute and deliver an amendment to the Lease reflecting such extensions. Landlord agrees to use reasonable diligence to complete all punchlist work listed in the aforesaid certificate promptly after substantial completion and shall furnish Tenant with a Certificate of Occupancy for the Premises.

9.    **Tenant Delays.** There shall be no extension of the scheduled commencement or expiration date of the term of the Lease (as otherwise permissibly extended under Paragraph 8 above) if the Work has not been substantially completed on said scheduled commencement date by reason of any delay attributable to Tenant ("Tenant Delays"), including without limitation:

       a.    the failure of Tenant to furnish all or any plans, drawings, specifications, finish details or the other information required under Paragraph 2 above on or before the date stated in Paragraph 2;

       b.    the failure of Tenant to grant approval of the Working Drawings within the time required under Paragraph 4 above;

27

    c.    the failure of Tenant to comply with the requirements of Paragraph 7 above;

    d.    Tenant's requirements for special work or materials, finishes, or installations other than the Building Standards or Tenant's requirements for special construction staging or phasing;

    e.    the performance of any Tenant Change Order (as defined in Paragraph 5 above) requested by Tenant or the performance of any work in the Premises by any person, firm or corporation employed by or on behalf of Tenant, or any failure to complete or delay in completion of such work; or

    f.    any other act or omission of Tenant that causes a delay.

10.    **Tenant Access.**  Landlord will grant to Tenant a license to have access to the Premises six (6) months prior to the date designated in the Lease for the commencement of the term of the Lease to allow Tenant to do other work required by Tenant to make the Premises ready for Tenant's use and occupancy (the "Tenant's Pre-Occupancy Work"). It shall be a condition to the grant by Landlord and continued effectiveness of such license that Tenant's employees, agents, contractors, workmen, mechanics, suppliers and invitees shall work in harmony and not interfere with Landlord or Landlord's agents in performing the Work in the Premises, Landlord's work in other premises and in common areas of the Building, or the general operation of the Building. If at any time any such person representing Tenant shall cause or threaten to cause such disharmony or interference, including labor disharmony, and Tenant fails to immediately institute and maintain such corrective actions as directed by Landlord, then Landlord may withdraw such license upon twenty-four (24) hours' verbal notice to Tenant.

    Any such entry into and occupancy of the Premises by Tenant or any person or entity working for or on behalf of Tenant shall be deemed to be subject to all of the terms, covenants, conditions and provisions of the Lease, excluding only the covenant to pay Rent. Landlord shall not be liable for any injury, loss or damage which may occur to any of Tenant's Pre-Occupancy Work made in or about the Premises or to property placed therein prior to the commencement of the term of the Lease, the same being at Tenant's sole risk and liability. Tenant shall be liable to Landlord for any damage to the Premises or to any portion of the Work caused by Tenant or any of Tenant's employees, agents, contractors, workmen or suppliers.

11.    Landlord warrants the Tenant Improvements for one (1) year following final completion and will assign any available manufacturer's warranties (to the extent assignable) unless Landlord is obligated under the Lease to repair or replace the item so warranted in which case the warranty will stay with Landlord.

12.    **Lease Provisions.**  The terms and provisions of the Lease, insofar as they are applicable to this Work Letter are hereby incorporated herein by reference..

13.    **Miscellaneous.**

    a.    This Work Letter shall be governed by the laws of the Commonwealth of Kentucky.

    b.    This Work Letter may not be amended except by a written instrument signed by the party or parties to be bound thereby.

    c.    Any person signing on behalf of Tenant warrants and represents he/she has authority to sign and bind Tenant.

    d.    Notices under this Work Letter shall be given in the same manner as under the Lease.

    e.    The headings set forth herein are for convenience only.

    f.    This Work Letter sets forth the entire agreement of Tenant and Landlord regarding the Work.

    g.    In the event that the final working drawings and specifications are included as part of the Initial Plan attached hereto, or in the event Landlord performs the Work without the necessity of preparing working drawings and specifications, then whenever the term "Working Drawings" is used, such term shall be deemed to refer to the Initial Plan and all supplemental plans and specifications approved by Landlord.

14.    **Construction Management Fee.**  Landlord shall be entitled to a payment of two percent (2%) of the hard costs associated with the completion of Tenant's buildout. This payment is for the coordination and day to day supervision performed by Landlord's staff in completing Tenant's buildout and shall be due upon final completion and receipt of a Certificate of Occupancy.

EXHIBIT D-1

BUILDING STANDARDS

1.    The Building Standard (herein so called) materials are the following:

A.    FLOORING:            Grade and quality of carpeting to be selected by Landlord, with color to be
                          selected by Tenant from those offered by Landlord.

B.    WINDOW
      COVERING:            At Landlord's option, miniblinds or vertical slat blinds in Landlord's uniform
                          color.

C.    CEILING:             Acoustical tiles - Grid system.

D.    PARTITIONS:          Sheetrock partitions with tape, bed, texture and paint finish, and/or vinyl
                          pre-clad sheetrock.

E.    DOORS:               Solid core door with metal frame and hardware.

F.    ELECTRICAL
      POWER
      OUTLETS:             Standard 110 volt duplex wall-mounted convenience outlets.

G.    LIGHT
      SWITCHES:            Single pole light switches.

H.    TELEPHONE
      FACILITIES:          Standard unwired telephone outlets (ring and string) mounted on partitions.
                          Tenant must make timely arrangements for telephone installation
                          and is responsible for all charges related to such installation.

I.    LIGHT
      FIXTURES:            Recessed fluorescent T8 lighting fixtures, LG&E (local utility) energy
                          efficient standard.

J.    VAV BOXES:           DDC mechanical controls; installed not later than December 31, 2014.

K.    RESTROOMS:           Automatic faucets and urinals.

J.    SUBMETERING:         Kilowatt usage will be submetered for the Premises; BTU usage for HVAC
                          will be submetered for the Premises.



**Computershare**
MEIDINGER TOWER
09/23/14

TEST FIT - 9th FLOOR



**Computershare**
MEIDINGER TOWER
09/23/14

TEST FIT - | 10th FLOOR

| PLAN DATA: 2015 | | | | | |
|---|---|---|---|---|---|
| TYPE | PROGRAM TDF | | INTERIM | PROGRAM | TEST FIT TOTAL |
| WPS (CSF) | 225 | 54 | 89 | 92 | 408 |
| WS2 (CSF) | 17 | 8 | 12 | 16 | 34 |
| WS3 (CSF) | 11 | | | | |
| TOTAL | 253 | 62 | 62 | 108 | 344 |
| FLOOR PLATE DATA: | | | | | |
| USABLE SF | 13,486* | | | | |
| RENTABLE SF | 13,986* | | | | |
| * SQUARE FOOTAGE AS PROVIDED BY LANDLORD | | | | | |

NELSON



**Computershare**
MEDINGER TOWER
09/23/14

TEST FIT - 11th FLOOR



**EXHIBIT E**

**PROPERTY LEGAL DESCRIPTION**

PARCEL A:

Tract A:

BEING Parcel 5 as shown on the Plat of the Louisville Galleria of record in Plat and Subdivision Book 34, Page 81 in the Office of the Clerk of the County Court of Jefferson County, Kentucky; provided, however, that there is excluded therefrom the following described parcel:

BEING all of the air space at and including the elevation 462.50 to 480.78 City of Louisville Datum and more particularly described as follows

BEGINNING at a point in the North line of Parcel 5 as shown on the Louisville Galleria, a plat of record in Plat and Subdivision Book 34 Page 81 in the Office of the Clerk of the County Court of Jefferson County, Kentucky, North 82 degrees 08 minutes 10 seconds West 38.31 feet as measured along said North line from its intersection with the centerline of River City Mall (closed in Civil Action 80C100207) to the true point of beginning; thence leaving said North line and with the existing faces of a wall the following courses and distances: South 07 degrees 57 minutes 40 seconds West 0.67 feet; South 82 degrees 02 minutes 20 seconds East 7.25 feet; South 07 degrees 38 minutes 02 seconds West 10.71 feet; North 82 degrees 20 minutes 28 seconds West 42.67 feet; North 07 degrees 53 minutes 44 seconds East 4.82 feet; North 82 degrees 16 minutes 36 seconds West 37.57 feet; South 07 degrees 52 minutes 48 seconds West 21.77 feet; North 82 degrees 07 minutes 12 seconds West 4.37 feet; South 07 degrees 15 minutes 24 seconds West 7.23 feet; North 81 degrees 58 minutes 18 seconds West 20.92 feet, South 07 degrees 18 minutes 04 seconds West 4.19 feet; North 81 degrees 44 minutes 45 seconds West 15.02 feet; North 07 degrees 52 minutes 53 seconds East 49.10 feet; South 82 degrees 12 minutes 34 seconds East 34.22 feet; North 07 degrees 07 minutes 36 seconds East 12.56 feet, South 82 degrees 17 minutes 41 seconds East 14.66 feet; and North 07 degrees 42 minutes 19 seconds East 0.11 feet to its intersection with the North line of Parcel 5 aforesaid; thence with said North line South 82 degrees 08 minutes 10 seconds East 64.25 feet to the point of beginning.

Tract II:

BEING a portion of Parcel 6, as shown on the Plat of the Louisville Galleria, of record in Plat and Subdivision Book 34, Page 81, in the Office of the Clerk of the County Court of Jefferson County, Kentucky and described as follows:

BEING all of the air space at and including the elevation 481.52 to 498.22 City of Louisville Datum and more particularly described as follows

BEGINNING at a point in the North line of Parcel 5 as shown on the Louisville Galleria, a plat of record in Plat and Subdivision Book 34, Page 81, in the Office of the Clerk of the County Court of Jefferson County, Kentucky, North 82 degrees 08 minutes 10 seconds West 38.11 feet as measured along said North line from its intersection with the centerline of River City Mall (closed in Civil Action 80C100207) to the true point of beginning; thence with said North line, North 82 degrees 08 minutes 10 seconds West 84.00 feet to its intersection with the East face of an existing wall; thence with said face of wall, North 07 degrees 32 minutes 19 seconds East 13.15 feet to its intersection with the South face of another existing wall; thence with said face of wall, South 82 degrees 17 minutes 36 seconds East 83.98 feet to its intersection with the West face of another existing wall; thence South 07 degrees 37 minutes 17 seconds West 13.59 feet to the point of beginning.

PARCEL B:

TOGETHER WITH beneficial appurtenant easements, rights and interests in land created by and as set out in the following instruments: (i) Special Warranty Deed and Grant of Easement between Oxford Properties, Inc. and The Commonwealth of Kentucky, of record in Deed Book 5176, Page 852, as corrected in Special Warranty Deed of Correction, Grant of Easement and Pedway Deed of record in Deed Book 5397, Page 600 and in Special Warranty Deed of Correction, Grant of Easement and Pedway Deed of Record in Deed Book 5684, Page 114, (II) Special Warranty Deeds between Oxford Properties, Inc. and The City of Louisville, Kentucky, of record in Deed Book 5179, Page 428 and Deed Book 5179, Page 433, as corrected in Special Warranty Deed of Correction, Reservations of Easements and Grant of Easement of record in Deed Book 5397, Page 609 and Special Warranty Deed of Correction, Reservation and Conveyance of Easement of record in Deed Book 5670, Page 334, and (III) Building Services Agreement between Oxford Properties, Inc. and Brown & Williamson Tobacco Corporation of record in Deed Book 5321, Page 505, the interest of Brown and Williamson Tobacco Corporation having been assigned to Batus Realty, Inc. by instrument of record in Deed Book 5349, Page 539, in the aforesaid Clerk's Office.

AND

PARCEL C:

TOGETHER WITH beneficial appurtenant easements, rights and interests in land created by and as set out in the following instruments:

Reciprocal Easement, License and Restriction Agreement dated October 27, 1988, by and between Oxford Properties, Inc., a California corporation, and First Capital Income and Growth Fund-Series XII, an Illinois limited partnership, recorded in Deed Book 5816, Page 496, in the aforesaid Clerk's Office.

34

Common Areas Agreement dated October 27, 1988, by and between Oxford Properties, Inc., a California corporation, and First Capital Income and Growth Fund-Series XII, an Illinois limited partnership, recorded in Deed Book 5816, Page 456, in the aforesaid Clerk's Office.

Building Services Agreement dated October 27, 1988, by and between Oxford Properties, Inc., a California corporation, and First Capital Income Fund-Series XII, an Illinois limited partnership recorded in Deed Book 5816, Page 405, in the aforesaid Clerk's Office.

BEING the same property acquired by FIRST CAPITAL INCOME AND GROWTH FUND-SERIES XII, an Illinois limited partnership, by Deed dated October 27, 1988, recorded in Deed Book 5816, Page 393, in the aforesaid Clerk's Office.

TAX DATA: District 03, Block 014L, Lot 0005, Sublot 0000.

61253068.2

61253068.3

## FIRST AMENDMENT TO LEASE AGREEMENT

THIS FIRST AMENDMENT TO LEASE AGREEMENT (this "Amendment") is entered into this ⎯15⎯ day of May, 2015, by and between DOF IV MEIDINGER TOWER, LLC, a Delaware limited liability company ("Landlord"), and COMPUTERSHARE, INC. ("Tenant").

### RECITALS:

A.      Landlord and Tenant are parties to that certain Lease Agreement dated November 5, 2014 (the "Lease"). Capitalized terms set out herein shall have the same meaning as set out in the Lease, unless otherwise defined herein.

B.      Pursuant to the Lease, Landlord has leased to Tenant space currently consisting of approximately 41,940 rentable square feet (the "Premises"), including approximately 13,980 square feet designated as Suite 900 ("Ninth Floor Premises"), in that building commonly known as the Meidinger Tower located at 462 South 4th Street, Louisville, Kentucky (the "Building").

C.      Tenant has requested to modify the delivery date of the Ninth Floor Premises and to amend certain other terms and conditions of the Lease, and Landlord is willing to do the same on the following terms and conditions.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant agree as follows:

1.      <u>Term of Ninth Floor Premises.</u>      Effective as of the date hereof, Section 2 of the Lease is amended such that the Term of the Lease with respect to the Ninth Floor Premises shall commence on October 1, 2015 and expire at 5:00 p.m. on July 31, 2020, unless earlier terminated as provided in the Lease.

2.      <u>Base Rent.</u> Effective as of the date hereof, Section 5.1 of the Lease is amended to delete the Base Rent chart in its entirety and replace it with the following:

| Time Period | 10th and 11th Floors Monthly Amount | Time Period | 9th Floor Monthly Amount |
|---|---|---|---|
| Commencement Date – March 31, 2016 | $0.00 | Commencement Date – March 31, 2016 | $0.00 |
| April 1, 2016 – March 31, 2017 | $15,923.22 | April 1, 2016 – March 31, 2017 | $7,961.61 |
| April 1, 2017 – March 31, 2018 | $16,241.68 | April 1, 2017 – March 31, 2018 | $8,120.84 |
| April 1, 2018 – March 31, 2019 | $16,566.52 | April 1, 2018 – March 31, 2019 | $8,283.26 |
| April 1, 2019 – March 31, 2020 | $16,897.85 | April 1, 2019 – March 31, 2020 | $8,448.93 |
| April 1, 2020 – July 31, 2020 | $17,235.80 | April 1, 2020 – July 31, 2020 | $8,617.90 |

For the avoidance of doubt, Tenant's obligation to pay Tenant's Share of Operating Expenses and any Additional Rent with respect to the Ninth Floor Premises shall not begin on the Commencement Date with respect to the Ninth Floor Premises as amended in this Amendment but shall begin when Tenant is first obligated to pay Base Rent.

3.      Early Delivery of Ninth Floor Premises. The second paragraph of Section 28.1 of the Lease is hereby deleted in its entirety and replaced with the following:

"With respect to the 9th Floor, Landlord shall permit Tenant and its employees, agents, contractors and suppliers advance entry (and such entry, alone, shall not constitute Tenant's taking possession of the Premises for the purpose of Section 6.3(c)) not later than June 1, 2015 and for a period of at least five (5) months so that Tenant may make Tenant Improvements in accordance with the Work Letter prior to Tenant's occupancy on October 1, 2015."

4.      Work Letter; Delivery of Ninth Floor Premises. Effective as of the date hereof, Exhibit D of the Lease the "Work Letter" is amended as follows:

(i)      in Section 1, Landlord shall deliver the Ninth Floor Premises in shell condition no later than June 1, 2015, and otherwise in accordance with the terms and conditions of the Lease, and

(ii)     in Section 10, Landlord shall grant to Tenant a license to have access to the Ninth Floor Premises five (5) months prior to the Commencement Date with respect to the Ninth Floor Premises to make the Ninth Floor Premises ready for Tenant's use and occupancy and otherwise on the terms and conditions in the Lease for such early entry.

5.      Broker.      Except for NAI Fortis Group ("Landlord's Broker") and Newmark Grubb Knight Frank ("Tenant's Broker"), Tenant represents and warrants that it has not had dealings with any real estate broker, finder or other person, with respect to this Amendment in any manner. Landlord shall pay such fees that are payable only said brokers pursuant to the terms and conditions of a separate agreement regarding such fees. Tenant shall indemnify and hold Landlord harmless from any and all damages resulting from any claims that may be asserted against Landlord by any other broker, finder or other person (including, without limitation, any substitute

or replacement broker claiming to have been engaged by Tenant), claiming to have dealt with Tenant in connection with the negotiation and/or execution of this Amendment. The provisions of this article shall survive the expiration or termination of the Lease.

4.    Binding Effect.    The amendments made to the Lease pursuant to this Amendment shall be binding upon the parties and their respective successors and assigns.

5.    Nature of Amendments.    Except as modified in this Amendment, the Lease remains unchanged and in full force and effect. To the extent there are any conflicts between the terms of this Amendment and the Lease, the terms of this Amendment shall govern.

6.    Tenant's Acknowledgement. Tenant acknowledges that Landlord has complied with all of its obligations under the Lease to date, and, to the extent not expressly modified hereby, all of the terms and conditions of said Lease shall remain unchanged, ratified and in full force and effect.

7.    Conditions of Premises. Tenant acknowledges that from and after April 1, 2016, without affecting any repair and maintenance obligations of the Landlord set forth in the Lease or herein, Landlord is leasing the Premises to Tenant "as is" without any representation or warranties of any kind (including, without limitation, any express or implied warranties of merchantability, fitness or habitability) and without obligation on the part of Landlord to alter, remodel, improve, repair or decorate the Premises or any part thereof, except as provided in this Amendment or in the Lease.

8.    Miscellaneous.    Each party to this Amendment shall execute all instruments and documents and take such further action as may be reasonably required to effectuate the purposes of this Amendment. This Amendment may be modified only by a writing executed by the parties hereto. This Amendment may be executed in multiple counterparts, each of which shall be deemed an original, and all such counterparts shall together constitute one and the same instrument. The invalidity of any portion of this Amendment shall not have any effect on the balance hereof. This Amendment shall be binding upon the parties hereto, as well as their successors, heirs, executors and assigns. This Amendment shall be governed by, and construed in accordance with, Kentucky law.

9.    Capital Improvements. Prior to the Commencement Date, Landlord shall convert the HVAC system from pneumatic controls to DDCs so as to damper off the Ninth Floor Premises. Tenant shall not be charged any portion of the cost of such HVAC system conversion.

10.   Staging Area. Beginning June 1, 2015, Landlord shall provide at no cost to Tenant the Eighth Floor of the Building for Tenant's use as a staging area for construction materials and equipment, furniture, etc. Staging Area shall be vacated by Tenant no later than October 31, 2015. Additionally, Landlord shall have the right to terminate the provisions of this paragraph 10 with thirty (30) days written notice to Tenant.

SIGNATURE PAGE ATTACHED HERETO

IN WITNESS WHEREOF, the undersigned have executed the foregoing instrument the day and year first above written.

**LANDLORD:**

**DOF IV MEIDINGER TOWER, LLC,**
a Delaware limited liability company

By: _____
Name: _____ Sam Chang _____
Title: _____ Authorized Signatory _____

**TENANT:**

**COMPUTERSHARE, INC.**

By: _____
Name: ___ NICK OLDFIELD ___
Title: ___ CFO ___

61340868.2

676545-V.3

## SECOND AMENDMENT TO LEASE AGREEMENT

THIS SECOND AMENDMENT TO LEASE AGREEMENT (this "Amendment") is entered into this 29th day of September, 2015, by and between DOF IV MEIDINGER TOWER, LLC, a Delaware limited liability company ("Landlord") and COMPUTERSHARE INC., a Delaware corporation ("Tenant").

### RECITALS:

A.     Landlord and Tenant are parties to that certain Lease Agreement dated November 5, 2014, and amended by that certain First Amendment to Lease Agreement dated June 15, 2015 (the "Lease"). Capitalized terms set out herein shall have the same meaning as set out in the Lease, unless otherwise defined herein.

B.     Pursuant to the Lease, Landlord has leased to Tenant space currently consisting of approximately 41,940 rentable square feet (the "Premises") in that building commonly known as the Meidinger Tower located at 462 South 4th Street, Louisville, Kentucky (the "Building").

C.     Tenant has exercised its Right of First Offer (as defined in the Lease) with respect to the 8th Floor of the Building (the "Eighth Floor Premises"), consisting of 13,980 rentable square feet as shown on Exhibit A attached hereto and incorporated herein. Landlord and Tenant desire to amend the Lease to expand the Premises to include the Eighth Floor Premises and to amend certain other terms and conditions of the Lease, and Landlord is willing to do the same on the following terms and conditions.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant agree as follows:

1.     Recitals; Defined Terms. The foregoing Recitals are, by this reference, hereby incorporated herein as if the same had been fully set forth in this Amendment. All capitalized terms used herein shall have the same meaning as in the Lease unless otherwise defined herein.

2.     Expansion of Premises. Commencing on the Expansion Commencement Date and continuing until the end of the Term, and notwithstanding anything to the contrary contained in the Lease, the Premises shall be expanded to include the Eighth Floor Premises. From and after the Expansion Commencement Date and until the end of the Term, any reference to the "Premises" in the Lease shall be deemed to refer to the Premises as expanded herein. After the Expansion Commencement Date, "Tenant's Share" shall be 16.89% for all purposes under the Lease.

Landlord shall deliver the Eighth Floor Premises to Tenant in Shell Condition promptly following the execution and delivery of this Amendment by both parties (and in any event prior to October 1, 2015), and Tenant shall accept the same in its Shell Condition. As used herein, "Shell Condition" shall mean the Eighth Floor Premises shall be in compliance with Legal Requirements, vacant, broom clean condition, ceilings in place, lighting in place (retrofitted to LG&E energy efficient standard), and all floor coverings, walls, wiring and any other obstructions shall be removed prior to such delivery including demolition of existing conditions as may be directed by Tenant's architect.

Tenant shall have advance access to the Eighth Floor Premises (and such entry, alone, shall not constitute Tenant's taking possession of the Eighth Floor Premises) for the purposes of preparing the Eighth Floor Premises for Tenant's occupancy, which access shall be on all the terms and conditions of the Lease (including, obligations with respect to maintenance of insurance) except for the obligation of Tenant to pay Base Rent and Tenant's Share of Operating Expenses and Tenant may only use the Eighth Floor Premises for the use set forth herein during such period. Tenant acknowledges that no representations or warranties as to the condition or repair of the Eighth Floor Premises have been made by Landlord and all such representations and warranties are expressly disclaimed (including, without limitation, implied representations and warranties), unless such are expressly set forth in this Amendment. Taking of possession of the Eighth Floor Premises by Tenant shall be deemed conclusively to establish that Landlord has delivered the Eighth Floor Premises in accordance with its obligations under this Amendment and the Lease and that the Premises are in good and satisfactory condition, as of such date of possession.

As used herein, the "Expansion Commencement Date" shall mean the earlier of: (i) January 15, 2016; and (ii) the date Tenant opens for business in the Eighth Floor Premises.

3.    Base Rent. Effective as of the date hereof, Section 5.1 of the Lease is amended to add the following to the Base Rent chart set forth therein:

| Time Period | Eighth Floor Premises Monthly Amount |
| --- | --- |
| Expansion Commencement Date – October 31, 2016 | $0.00 |
| November 1, 2016 – November 30, 2016 | $2,388.48 |
| December 1, 2016 – March 31, 2017 | $7,961.61 |
| April 1, 2017 – March 31, 2018 | $8,120.84 |
| April 1, 2018 – March 31, 2019 | $8,283.26 |
| April 1, 2019 – March 31, 2020 | $8,448.93 |
| April 1, 2020 – July 31, 2020 | $8,617.90 |

For the avoidance of doubt, Tenant's obligation to pay any Additional Rent with respect to the Eighth Floor Premises shall commence November 1, 2016. Nothing contained herein shall affect Tenant's obligation with respect to Base Rent, Tenant's Share of Operating Expenses or Additional Rent with respect to any portion of the Premises other than the Eighth Floor Premises.

4.     Staging Area.   Beginning the earlier of January 15, 2016, or as mutually agreed, Landlord shall allow Tenant to use the unoccupied portion of the seventh floor of the Building for Tenant's use as a staging area for construction materials and equipment, furniture, etc. for a period not to exceed five (5) months. Such staging area shall be vacated by Tenant and surrendered to Landlord in broom clean condition with any damage caused by Tenant's use as a staging area repaired prior to the end of such five (5) month period. Additionally, Landlord shall have the right to terminate the provisions of this Section 4 prior to the end of such five (5) month period and Tenant shall vacate and surrender the staging area to Landlord with thirty (30) days written notice to Tenant. Except as set forth in this Section 4, all terms and conditions of the Lease applicable to the Premises shall be applicable to the staging area except that Tenant shall only use the staging area as provided in this Section 4 and Tenant shall not be obligated to pay Base Rent or Tenant's Share of Operating Expenses with respect to the staging area.

5.     Capital Improvements.  Prior to the Expansion Commencement Date, Landlord, at no cost to Tenant, shall convert the HVAC system from pneumatic controls to DDCs so as to damper off the Eighth Floor Premises.

6.     Broker.      Except for NAI Fortis Group ("Landlord's Broker") and Newmark Grubb Knight Frank ("Tenant's Broker"), Tenant represents and warrants that it has not had dealings with any real estate broker, finder or other person, with respect to this Amendment in any manner. Landlord shall pay such fees that are payable only to Landlord and Tenant's Broker pursuant to the terms and conditions of a separate agreement regarding such fees. Tenant shall indemnify and hold Landlord harmless from any and all damages resulting from any claims that may be asserted against Landlord by any other broker, finder or other person (including, without limitation, any substitute or replacement broker claiming to have been engaged by Tenant), claiming to have dealt with Tenant in connection with the negotiation and/or execution of this Amendment. The provisions of this article shall survive the expiration or termination of the Lease.

7.     Binding Effect.      The amendments made to the Lease pursuant to this Amendment shall be binding upon the parties and their respective successors and assigns.

8.     Nature of Amendments.      Except as modified in this Amendment, the Lease remains unchanged and in full force and effect. To the extent there are any conflicts between the terms of this Amendment and the Lease, the terms of this Amendment shall govern.

9.   Tenant's Acknowledgement. Tenant acknowledges that Landlord has complied with all of its obligations under the Lease to date, and, to the extent not expressly modified hereby, all of the terms and conditions of said Lease shall remain unchanged, ratified and in full force and effect.

10.   Miscellaneous.       This Amendment, together with the Lease, contains all the terms, covenants, conditions and agreements between Landlord and Tenant relating to the matters provided for in this instrument.  No prior or other agreement or understanding pertaining to such matters shall be valid or of any force and effect.  Each party to this Amendment shall execute all instruments and documents and take such further action as may be reasonably required to effectuate the purposes of this Amendment.  This Amendment may be modified only by a writing executed by the parties hereto.  This Amendment may be executed in multiple counterparts, each of which shall be deemed an original, and all such counterparts shall together constitute one and the same instrument. The invalidity of any portion of this Amendment shall not have any effect on the balance hereof.  This Amendment shall be binding upon the parties hereto, as well as their successors, heirs, executors and assigns.  This Amendment shall be governed by, and construed in accordance with, Kentucky law.

SIGNATURE PAGE ATTACHED HERETO

IN WITNESS WHEREOF, the undersigned have executed the foregoing instrument the day and year first above written.

**LANDLORD:**

**DOF IV MEIDINGER TOWER, LLC,**
a Delaware limited liability company

By: _____

Name: _____
Sam Chang

Title: _____
Authorized Signatory

**TENANT:**

**COMPUTERSHARE INC.,**
a Delaware corporation

By: _____

Name: _____
NICK OLDFIELD

Title: _____
CFO

<u>Exhibit A</u>



**8th Floor Core/Shell Plan**

Meidinger Tower
462 South Fourth Street - Louisville, KY

Note: Notwithstanding the above depiction, elevators, structural columns, elevator shafts, stairwells, mechanical rooms, and similar areas that are not generally open to tenant use are not part of the Eight Floor Premises

## THIRD AMENDMENT TO LEASE AGREEMENT

THIS THIRD AMENDMENT TO LEASE AGREEMENT (this "**Amendment**") is entered into this /0th day of October, 2016 (the "**Effective Date**"), by and between DOF IV MEIDINGER TOWER, LLC, a Delaware limited liability company ("**Landlord**") and COMPUTERSHARE INC., a Delaware corporation ("**Tenant**").

### RECITALS:

A.      Landlord and Tenant are parties to that certain Lease Agreement dated November 5, 2014, and amended by that certain First Amendment to Lease Agreement dated June 15, 2015 and that certain Second Amendment to Lease Agreement dated September 29, 2015 (the "**Lease**"). Capitalized terms set out herein shall have the same meaning as set out in the Lease, unless otherwise defined herein.

B.      Pursuant to the Lease, Landlord has leased to Tenant space currently consisting of approximately 55,920 rentable square feet (the "**Existing Premises**"), consisting of the entire eighth, ninth, tenth and eleventh floors in that building commonly known as the Meidinger Tower located at 462 South 4th Street, Louisville, Kentucky (the "**Building**").

C.      Tenant has exercised its Right of First Offer (as defined in the Lease) with respect to the seventh floor of the Building (the "**Seventh Floor Premises**"), consisting of 13,980 rentable square feet as shown on Exhibit A attached hereto and incorporated herein. Landlord and Tenant desire to amend the Lease to expand the Premises to include the Seventh Floor Premises and to amend certain other terms and conditions of the Lease, and Landlord is willing to do the same on the terms and conditions set forth in this Amendment.

D.      Landlord and Tenant desire to amend the Lease to expand the Premises to include the sixteenth floor of the Building (the "**Sixteenth Floor Premises**"), consisting of 14,098 rentable square feet as shown on Exhibit B attached hereto and incorporated herein, and to amend certain other terms and conditions of the Lease, and Landlord is willing to do the same on the terms and conditions set forth in this Amendment.

E.      Landlord and Tenant desire to amend the Lease to expand the Premises to include the fifth floor of the Building (the "**Fifth Floor Premises**" and, together with the Seventh Floor Premises and the Sixteenth Floor Premises, collectively, the "**Third Amendment Expansion Premises**"), consisting of 13,980 rentable square feet as shown on Exhibit C attached hereto and incorporated herein, and to amend certain other terms and conditions of the Lease, and Landlord is willing to do the same on the terms and conditions set forth in this Amendment.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant agree as follows:

11843080V.4

1.     Recitals; Defined Terms.  The foregoing Recitals are, by this reference, hereby incorporated herein as if the same had been fully set forth in this Amendment.  All capitalized terms used herein shall have the same meaning as in the Lease unless otherwise defined herein.

2.     Extension of Lease Term.  The Lease Term is hereby extended to the date that is the final day of the month in which the seventh (7th) anniversary of the Seventh Floor Expansion Commencement Date (as defined below) occurs (the "Expiration Date").  Upon Landlord's request, Tenant shall execute and deliver a written agreement specifying the Seventh Floor Expansion Commencement Date and the Expiration Date in substantially the form set forth in Exhibit D attached hereto, provided however, that the failure to execute same shall not affect the validity of this Amendment.

3.     Expansion of Premises to Include the Seventh Floor Premises.

   a.     Expansion of Premises; Delivery.  Commencing on the date on which Landlord delivers the Seventh Floor Premises to Tenant in Shell Condition (the "Seventh Floor Expansion Commencement Date"), and continuing until the end of the Lease Term, and notwithstanding anything to the contrary contained in the Lease, the Premises shall be expanded to include the Seventh Floor Premises.  From and after the Seventh Floor Expansion Commencement Date and until the end of the Lease Term, any reference to the "Premises" in the Lease shall be deemed to refer to the Premises as expanded to include the Seventh Floor Premises.  After the Seventh Floor Expansion Commencement Date, "Tenant's Share" shall be 21.11% for all purposes under the Lease.  Landlord shall deliver the Seventh Floor Premises to Tenant in Shell Condition no later than October 15, 2016, subject to Force Majeure and Tenant Delays, and Tenant shall accept the same in its Shell Condition.  As used in this Agreement, "Shell Condition" shall mean that each portion of the Third Amendment Expansion Premises shall be in compliance with the Legal Requirements, vacant, broom clean condition, with ceilings in place, lighting in place (retrofitted to LG&E energy efficient standard), and all floor coverings, walls, wiring and any other obstructions removed, including demolition of existing conditions as may be directed by Tenant's architect.

   b.     Base Rent.  Effective as of the date hereof, Section 5.1 of the Lease is amended to add the following to the Base Rent chart set forth therein:

| Time Period | Seventh Floor Premises Monthly Amount |
| --- | --- |
| Seventh Floor Expansion Commencement Date – April 30, 2017 | $0.00 |
| May 1, 2017 – September 30, 2017 | $11,067.50 |
| October 1, 2017 – September 30, 2018 | $11,288.85 |
| October 1, 2018 – September 30, 2019 | $11,514.63 |
| October 1, 2019 – September 30, 2020 | $11,744.92 |
| October 1, 2020 – September 30, 2021 | $11,979.82 |
| October 1, 2021 – September 30, 2022 | $12,219.41 |

2

| October 1, 2022 – September 30, 2023 | $12,463.89 |
| October 1, 2023 – Expiration Date | $12,713.17 |

c.    Additional Rent. Tenant's obligation to pay Tenant's Share of Operating Expenses and any Additional Rent with respect to the Seventh Floor Premises shall begin on May 1, 2017. Nothing contained herein shall affect Tenant's obligation with respect to Base Rent, Tenant's Share of Operating Expenses, or Additional Rent with respect to any portion of the Premises other than the Seventh Floor Premises.

d.    Capital Improvements.

i.    At such time as mutually agreed by Landlord and Tenant, Landlord, at no cost to Tenant, shall convert the HVAC system from pneumatic controls to DDCs so as to damper off the Seventh Floor Premises.

ii.    At such time as mutually agreed by Landlord and Tenant, Landlord shall, at no cost to Tenant, paint all toilet partitions in the Seventh Floor Premises similar to those painted in Tenant's restrooms on the 9th Floor and 10th and 11th Floors and install automatic faucets and urinals, and privacy panels between urinals in the Seventh Floor Premises.

iii.    All base Building systems servicing the Seventh Floor Premises shall be in good working order and repair and the Seventh Floor Premises shall be in full compliance with all applicable code requirements.

4.    Expansion of Premises to Include the Sixteenth Floor Premises.

a.    Expansion of Premises; Delivery. Commencing on the date on which Landlord delivers the Sixteenth Floor Premises to Tenant in Shell Condition (the "Sixteenth Floor Expansion Commencement Date"), and continuing until the end of the Lease Term, and notwithstanding anything to the contrary contained in the Lease, the Premises shall be expanded to include the Sixteenth Floor Premises. From and after the Sixteenth Floor Expansion Commencement Date and until the end of the Lease Term, any reference to the "Premises" in the Lease shall be deemed to refer to the Premises as expanded to include the Sixteenth Floor Premises. After the Sixteenth Floor Expansion Commencement Date, "Tenant's Share" shall be 25.37% for all purposes under the Lease. Landlord shall deliver the Sixteenth Floor Premises to Tenant in Shell Condition no later than November 15, 2016, subject to Force Majeure and Tenant Delays, and Tenant shall accept the same in its Shell Condition.

b.    Base Rent. Effective as of the date hereof, Section 5.1 of the Lease is amended to add the following to the Base Rent chart set forth therein:

| Time Period | Sixteenth Floor Premises Monthly Amount |
| --- | --- |

3

11843080V.4

| | |
|---|---|
| Sixteenth Floor Expansion Commencement Date – August 31, 2017 | $0.00 |
| September 1, 2017 – September 30, 2017 | $11,160.92 |
| October 1, 2017 – September 30, 2018 | $11,384.14 |
| October 1, 2018 – September 30, 2019 | $11,611.82 |
| October 1, 2019 – September 30, 2020 | $11,844.05 |
| October 1, 2020 – September 30, 2021 | $12,080.94 |
| October 1, 2021 – September 30, 2022 | $12,322.55 |
| October 1, 2022 – September 30, 2023 | $12,569.00 |
| October 1, 2023 – Expiration Date | $12,820.38 |

      c.    <u>Additional Rent</u>. Tenant's obligation to pay Tenant's Share of Operating Expenses and any Additional Rent with respect to the Sixteenth Floor Premises shall begin on September 1, 2017. Nothing contained herein shall affect Tenant's obligation with respect to Base Rent, Tenant's Share of Operating Expenses, or Additional Rent with respect to any portion of the Premises other than the Sixteenth Floor Premises.

      d.    <u>Capital Improvements</u>.

        i.    At such time as mutually agreed by Landlord and Tenant, Landlord, at no cost to Tenant, shall convert the HVAC system from pneumatic controls to DDCs so as to damper off the Sixteenth Floor Premises.

        ii.    At such time as mutually agreed by Landlord and Tenant, Landlord shall, at no cost to Tenant, paint all toilet partitions in the Sixteenth Floor Premises similar to those painted in Tenant's restrooms on the 9th Floor and 10th and 11th Floors and install automatic faucets and urinals, and privacy panels between urinals in the Sixteenth Floor Premises.

        iii.    All base Building systems servicing the Sixteenth Floor Premises shall be in good working order and repair and the Sixteenth Floor Premises shall be in full compliance with all applicable code requirements.

5.    <u>Expansion of Premises to Include the Fifth Floor Premises</u>.

      a.    <u>Expansion of Premises; Delivery</u>. Commencing on the date on which Landlord delivers the Fifth Floor Premises to Tenant in Shell Condition (the "**Fifth Floor Expansion Commencement Date**"), and continuing until the end of the Lease Term, and notwithstanding anything to the contrary contained in the Lease, the Premises shall be expanded to include the Fifth Floor Premises. From and after the Fifth Floor Expansion Commencement Date and until the end of the Lease Term, any reference to the "Premises" in the Lease shall be deemed to refer to the Premises as expanded to include the Fifth Floor Premises. After the Fifth Floor Expansion Commencement Date, "Tenant's Share" shall be 29.59% for all purposes under the Lease. Landlord shall deliver the Fifth Floor Premises to Tenant in Shell Condition no later than May 1, 2017,

4

subject to Force Majeure and Tenant Delays, and Tenant shall accept the same in its Shell Condition.

   b.   Base Rent. Effective as of the date hereof, Section 5.1 of the Lease is amended to add the following to the Base Rent chart set forth therein:

| Time Period | Fifth Floor Premises Monthly Amount |
|---|---|
| Fifth Floor Expansion Commencement Date – 210th day following Fifth Floor Expansion Commencement Date | $0.00 |
| 211th day following Fifth Floor Expansion Commencement Date – September 30, 2018 | $11,288.85 |
| October 1, 2018 – September 30, 2019 | $11,514.63 |
| October 1, 2019 – September 30, 2020 | $11,744.92 |
| October 1, 2020 – September 30, 2021 | $11,979.82 |
| October 1, 2021 – September 30, 2022 | $12,219.41 |
| October 1, 2022 – September 30, 2023 | $12,463.89 |
| October 1, 2023 – Expiration Date | $12,713.17 |

   c.   Additional Rent. Tenant's obligation to pay Tenant's Share of Operating Expenses and any Additional Rent with respect to the Fifth Floor Premises shall begin on the date on which Tenant is first obligated to pay Base Rent with respect to the Fifth Floor Premises. Nothing contained herein shall affect Tenant's obligation with respect to Base Rent, Tenant's Share of Operating Expenses, or Additional Rent with respect to any portion of the Premises other than the Fifth Floor Premises.

   d.   Capital Improvements.

      i.   At such time as mutually agreed by Landlord and Tenant, Landlord, at no cost to Tenant, shall convert the HVAC system from pneumatic controls to DDCs so as to damper off the Fifth Floor Premises.

      ii.   At such time as mutually agreed by Landlord and Tenant, Landlord shall, at no cost to Tenant, paint all toilet partitions in the Fifth Floor Premises similar to those painted in Tenant's restrooms on the 9th Floor and 10th and 11th Floors and install automatic faucets and urinals, and privacy panels between urinals in the Fifth Floor Premises.

      iii.   All base Building systems servicing the Fifth Floor Premises shall be in good working order and repair and the Fifth Floor Premises shall be in full compliance with all applicable code requirements

   6.   Tenant Access for Preparation of the Third Amendment Expansion Premises. Tenant shall have advance access to the applicable portion of the Third Amendment Expansion Premises (and such entry, alone, shall not constitute Tenant's taking possession of such portion

5

11843080V.4

of the Third Amendment Expansion Premises) for the purposes of preparing such portion of the Third Amendment Expansion Premises for Tenant's occupancy, which access shall be on all the terms and conditions of the Lease (including, obligations with respect to maintenance of insurance) except for the obligation of Tenant to pay Base Rent and Tenant's Share of Operating Expenses and Tenant may only use such portion of the Third Amendment Expansion Premises for the use set forth herein during such period. Tenant acknowledges that no representations or warranties as to the condition or repair of the Third Amendment Expansion Premises have been made by Landlord and all such representations and warranties are expressly disclaimed (including, without limitation, implied representations and warranties), unless such are expressly set forth in this Amendment. Taking of possession of any portion of the Third Amendment Expansion Premises by Tenant for reasons beyond preparation of such portion of the Third Amendment Expansion Premises for Tenant's occupancy shall be deemed conclusively to establish that Landlord has delivered such portion of the Third Amendment Expansion Premises in accordance with its obligations under this Amendment and the Lease and that such portion of the Third Amendment Expansion Premises are in good and satisfactory condition, as of such date of possession.

7.  _Staging Area._  Beginning on the earlier of the Seventh Floor Expansion Commencement Date or the thirty-first (31st) day following the Effective Date and continuing through and including the one hundred twentieth (120th) day after Fifth Floor Expansion Commencement Date (such period, the "**Staging Term**"), Landlord shall allow Tenant to use no less than two thousand (2,000) square feet of the unoccupied portion of the lower level (also known as the service level) of the Building typically available for use by tenants for Tenant's use as a staging area (the "**Staging Area**") for construction materials and equipment, furniture and other items necessary to Tenant's completion of the Tenant Improvements. Additionally, Landlord shall have the right to relocate the Staging Area or any portion thereof to a similarly sized and situated area of Landlord's choosing and Tenant shall vacate and surrender the Staging Area, or designated portion thereof, to Landlord with thirty (30) days written notice to Tenant or at such time as Landlord makes replacement space available to Tenant for use as the Staging Area. The Staging Area shall be vacated by Tenant and surrendered to Landlord in broom clean condition with any damage caused by Tenant's use as a staging area repaired prior to the end of the Staging Term. Except as set forth in this Section 7, all terms and conditions of the Lease applicable to the Premises shall be applicable to the Staging Area except that Tenant shall only use the Staging Area as provided in this Section 7 and Tenant shall not be obligated to pay Base Rent or Tenant's Share of Operating Expenses with respect to the Staging Area.

8.  _Tenant Improvement Allowance._  See Exhibit E attached hereto.

9.  _Base Rent for Existing Premises._  As of the Effective Date hereof, Section 5.1 of the Lease is amended to add the following to the Base Rent chart set forth therein:

| Time Period | 10th and 11th Floors Monthly Amount | 9th Floor Monthly Amount | Eighth Floor Premises Monthly Amount |
|---|---|---|---|
|  |  |  |  |

6

11843080V.4

| August 1, 2020 – July 31, 2021 | $18,640.00 | $9,320.00 | $9,320.00 |
|---|---|---|---|
| August 1, 2021 – July 31, 2022 | $19,012.80 | $9,506.40 | $9,506.40 |
| August 1, 2022 – July 31, 2023 | $19,393.06 | $9,696.53 | $9,696.53 |
| August 1, 2023 – Expiration Date | $19,780.92 | $9,890.46 | $9,890.46 |

10.    <u>Existing Premises Base Rent Abatement</u>.  Provided Tenant is not in default of the terms of the Lease, and does not default in the terms of this Lease beyond any cure or grace period during the Lease Term, Landlord shall forgive payment of monthly installments of Base Rent and Additional Rent for the Existing Premises for six (6) consecutive months beginning on the December 1, 2016 and ending on May 31, 2017.

11.    <u>Back-Up Generator</u>.

a.    From the Seventh Floor Commencement Date through and including October 31, 2019 (the "**Generator Option Period**"), Tenant shall have the option of connecting to the Generator (as defined below) for the provision of emergency power. In the event Tenant fails to exercise such option prior to the end of the Generator Option Period, such option shall expire. From the date that Tenant first connects the Premises to the Generator through the end of the Term, Tenant shall (i) operate, repair and maintain the Generator System (as defined below) and bear the costs of operating, maintaining, repairing, testing and replacing the Generator System, (ii) obtain and maintain all licenses and permits required for the installation, maintenance, replacement and operation of the Generator System and (iii) otherwise comply in all material respects with all applicable Laws relating to the Generator System.  Tenant acknowledges that the Generator is not connected to the Premises as of the Effective Date.

b.    As used herein the term (i) "**Generator**" means the CAT SR4B Generator and related systems as currently in place on the third (3rd) floor of the Building and (ii) "**Generator System**" means the Generator and associated equipment up to and including all automatic transfer switches. The Generator System includes, but is not limited to, the fuel storage tank, pumps, and piping equipment relating to the Generator up to and including all automatic transfer switches.  As used herein, the Generator and the Generator System shall not include the generator and associated systems providing back-up electricity for the Building.

c.    The rights granted to Tenant to draw emergency power from the Generator are given in connection with, and as part of the rights created under, this Lease and are not separately transferable or assignable, and the rights granted to Tenant hereunder shall terminate upon the expiration or sooner termination of this Lease.

d.    Tenant acknowledges that Landlord's providing Tenant with access to the Generator without additional consideration and, as such, Landlord shall have no liability to Tenant for the failure of the Generator to operate.

7

c.      During such time that Tenant's Premises are connected to the Generator, Tenant shall have sole and exclusive use of the Generator and the Generator System, and neither Landlord nor other tenants in the Building shall have use thereof.

12.     Storage Space Expansion Option. Tenant shall have the ongoing right to license on one or more occasions (the "**Storage License Option**") with respect to up to 2,000 square feet of storage space on the lower level (also known as the service level) of the Building (subject to availability), as shown on Exhibit F attached hereto and incorporated herein (the "**Storage Space**"). The license fee for the Storage Space shall be $8.00 per square foot (the "**Storage Rent**") and no additional amounts shall be payable with respect to the Storage Space. Tenant's Storage License Option shall be exercised by Tenant's written notice to Landlord of its intent to exercise the Storage License Option (the "**Storage License Notice**"), whereupon Landlord shall prepare a license agreement providing for Tenant's licensing of the Storage Space, or a portion thereof, as applicable. The license agreement shall set forth the Storage Rent and other terms of license for the Storage Space on the same terms and conditions as are set forth in Landlord's then standard form of license agreement. The license agreement shall be sent to Tenant within thirty (30) days after Landlord's receipt of the Storage License Notice, and Tenant shall execute and return the license agreement to Landlord within ten (10) business days thereafter. The term for the Storage Space shall commence upon the commencement date stated in the license agreement, and all of the terms stated in the license agreement shall govern Tenant's licensing of the Storage Space. If Landlord is delayed delivering possession of the Storage Space due to the holdover or unlawful possession of such space by any party, Landlord shall have no liability therefor and shall use its best efforts to obtain possession of the Storage Space, and the commencement of the term for the Storage Space shall be postponed until the date Landlord delivers possession of the Storage Space to Tenant free from occupancy by any party.

13.     Expansion Rights.

a.      The first sentence of Section 28.3(i) is deleted and replaced as follows:

"(i)     **Expansion Option.** During the first twenty-four (24) months of the Lease Term, Tenant shall have the on-going right to expand the Premises on one or more occasions (the "Expansion Option") to any portion of the Building except for any portion of floors 21, 22, 24, 25 and 26 (the "Expansion Option")."

b.      Section 28.3(ii) of the Lease is deleted in full and replaced as follows:

"(ii)     **Right of First Offer.** Through and including February 1, 2017, Tenant shall have the on-going right of first offer on one or more occasions (the "Right of First Offer") with respect to one additional floor, or any portion thereof, of the Building, but limited to the seventeenth (17th) floor, the eighteenth (18th) floor, the nineteenth (19th) floor, the fourth (4th) floor or the twenty-third (23rd) floor, as selected by Landlord in Landlord's sole discretion (the "Offering Space"). Tenant's Right of First Offer shall be exercised as follows: at any time on or before February 1, 2017, after Landlord has determined that the Offering Space has become available (whether due to existing vacancy or due to an existing tenant which has an existing option to renew or extend the term of its lease deciding not to renew or extend,) prior to leasing

8

such Offering Space to a party other than the existing tenant, Landlord shall advise Tenant in writing of the availability, location and size of the Offering Space. Tenant shall thereafter have until the date which is ten (10) business days following the date Tenant receives notice of the Offering Space from the Landlord to exercise its Right of First Offer with respect to such Offering Space by providing written notice to Landlord (the "Notice of ROFO"), whereupon Landlord shall prepare an amendment to this Lease providing for Tenant's leasing of the Offering Space. The amendment shall set forth the terms of lease for the Offering Space on the same terms and conditions as are set forth in the Lease (to the extent such terms are applicable to the Offering Space), and shall provide for, without limitation, delivery of the Offering Space to Tenant on or before October 1, 2017, five (5) months of free rent with respect to the Offering Space and a tenant improvement allowance in the amount of $30.00 per rentable square foot of the Offering Space, such tenant improvement allowance to be prorated over the remaining period of the Lease Term. The amendment shall be sent to Tenant within thirty (30) days after Landlord's receipt of the Notice of ROFO, and Tenant shall execute and return the amendment to Landlord within (10) business days thereafter. The term for the Offering Space shall commence on the date on which Landlord delivers the Offering Space to Tenant in Shell Condition and thereupon such Offering Space shall be considered a part of the Premises, and the Lease, as modified by the terms stated in the amendment, shall govern Tenant's leasing of the Offering Space. If Landlord is delayed delivering possession of the Offering Space due to the holdover or unlawful possession of such space by any party, Landlord shall have no liability therefor and shall use its best efforts to obtain possession of the Offering Space, and the commencement of the term for the Offering Space shall be postponed until the date Landlord delivers possession of the Offering Space to Tenant free from occupancy by any party and the tenant improvement allowance shall be further prorated."

    c.  Section 28.3(iii) of the Lease is deleted in full and replaced as follows:

"(iii)  **Right of First Refusal**.

    (a)    Tenant shall have the on-going right of first refusal on one or more occasions (the "ROFR") for any space in the Building located on or below the twentieth (20th) floor (the "ROFR Space"). Tenant's ROFR shall be exercised as follows: if at any time Landlord receives a bona fide written offer from any third party (an "Offer") to lease all or any part of the ROFR Space, and if Landlord, in good faith, is willing to accept such Offer, then Landlord will promptly provide Tenant with written notice of the terms and conditions of such Offer. Tenant shall thereafter have ten (10) business days to exercise its ROFR by providing written notice to Landlord (the "Notice of ROFR"), whereupon Landlord shall prepare an amendment to the Lease providing for Tenant's leasing of the ROFR Space. The amendment shall set forth the terms of lease for the ROFR Space on the same terms and conditions as are set forth in the Offer except the term shall be coterminous with this Lease (including the Renewal Option); provided, however, if the Offer occurs during the first twenty-four (24) months following the effective date of the Third Amendment to Lease Agreement between Landlord and Tenant (the "Third Amendment"), the amendment shall set forth the terms of lease for the ROFR Space on the same terms and conditions as are set forth in Section 28.3(ii) of the Lease, as modified by the Third Amendment (as if Tenant had exercised its Right of First

9

11843080V.4

Offer). The amendment shall be sent to Tenant within thirty (30) days after Landlord's receipt of the Notice of ROFR, and Tenant shall execute and return the amendment to Landlord within ten (10) business days thereafter. The term for the ROFR Space shall commence upon the commencement date stated in the amendment and thereupon such ROFR Space shall be considered a part of the Premises, and the Lease, as modified by the terms stated in the amendment, shall govern Tenant's leasing of the ROFR Space. In the event Tenant declines to exercise its ROFR with respect to any ROFR Space, or fails to timely provide the Notice of ROFR or execute the amendment incorporating the ROFR Space applicable thereto (any such event a "ROFR Declination"), Landlord shall have the right to lease such ROFR Space to a third-party on the same terms and conditions as set forth in the Offer; provided that, if Landlord does not lease such ROFR Space within sixty (60) days after a ROFR Declination, then Tenant will retain the ROFR with respect to such ROFR Space. In the event any ROFR Space is leased to a third-party, Tenant's ROFR will terminate with respect to such ROFR Space.

(b)     **Additional Qualified Right of First Refusal.**  Tenant shall also have the on-going right of first refusal on one or more occasions (the "23rd Floor ROFR") for any space in the Building located on the twenty-third (23rd) floor (the "23rd Floor ROFR Space"), subject to the senior right of refusal of Mountjoy Chilton & Medley, LLP, a Kentucky limited liability partnership, or its permitted assignees, with respect to the 23rd Floor ROFR Space (the "Senior ROFR Right"). Tenant's 23rd Floor ROFR shall be exercised in the same manner as set forth in Section 28.3(iii) above, but Landlord shall only be required to deliver a Notice of ROFR with respect to the 23rd Floor ROFR Space if the Senior ROFR Right has not been exercised."

14.     Option to Extend.  The first sentence of Section 28.2 of the Lease is hereby deleted and replaced as follows:

"Provided Tenant is not in default of the terms of the Lease beyond any applicable cure period herein, Tenant shall have two (2) options (each such option, hereinafter, the "Renewal Option") to extend the Lease Term for a period of five (5) years each (each such period, hereinafter, the "Renewal Period")."

15.     No Termination Option.  Section 28.4 of the Lease is hereby deleted in full and Tenant shall have no further Termination Option.

16.     Exterior Signage.  Tenant shall have the option at its sole cost and expense to install its signage on the exterior of the Building in the location shown on **Exhibit G** attached hereto and incorporated herein (the "**Exterior Building Signage**"). Landlord shall use reasonable efforts to cooperate with Tenant in connection with Tenant obtaining all necessary permits and governmental approvals necessary to install the Exterior Building Signage, provided that Tenant shall reimburse Landlord for or, at Landlord's election, directly pay any of Landlord's costs and expenses associated with such permits and governmental approvals. In the event that the Tenant named herein or a Transferee shall cease to occupy 69,521 rentable square feet or more of the Building, Tenant shall, upon demand by Landlord, remove all of the Exterior Building Signage at Tenant's sole cost and expense and repair any damage to the Building

10

11843080V.4

caused by such removal. No subtenant of less than all of the Premises or assignee of less than all of the remainder of the Lease Term shall have the right to the Exterior Building Signage. The rights granted to Tenant to the Exterior Building Signage are given in connection with, and as part of the rights created under, this Lease and are not separately transferable or assignable, and the rights granted to Tenant hereunder shall terminate upon the expiration or sooner termination of this Lease.

17.    Non-Disturbance.   Concurrently with execution of this Amendment, Landlord will provide Tenant with Landlord's Mortgagee's then current form of subordination, non-disturbance and attornment agreement.

18.    Broker.   Except for NAI Fortis Group ("**Landlord's Broker**") and Howard Ecker + Company ("**Tenant's Broker**"), Tenant represents and warrants that it has not had dealings with any real estate broker, finder or other person, with respect to this Amendment in any manner. Landlord shall pay such fees that are payable only to Landlord's Broker and Tenant's Broker pursuant to the terms and conditions of a separate agreement regarding such fees. Tenant shall indemnify and hold Landlord harmless from any and all damages resulting from any claims that may be asserted against Landlord by any other broker, finder or other person (including, without limitation, any substitute or replacement broker claiming to have been engaged by Tenant), claiming to have dealt with Tenant in connection with the negotiation and/or execution of this Amendment. The provisions of this article shall survive the expiration or termination of the Lease.

19.    Binding Effect.   The amendments made to the Lease pursuant to this Amendment shall be binding upon the parties and their respective successors and assigns.

20.    Nature of Amendments.   Except as modified in this Amendment, the Lease remains unchanged and in full force and effect. To the extent there are any conflicts between the terms of this Amendment and the Lease, the terms of this Amendment shall govern.

21.    Acknowledgements.   Landlord and Tenant each acknowledge that the other party to the Lease has complied with all of its obligations under the Lease to date, and, to the extent not expressly modified hereby, all of the terms and conditions of said Lease shall remain unchanged, ratified and in full force and effect.

22.    Notices.   Tenant's address for notices and other communications set forth in Section 27.7 of the Lease is deleted and replaced as follows:

Tenant:

Computershare Inc.
7600 Grant Street
Burr Ridge IL 60527
Attn: Facilities Manager

with a copy to:

11

11843080V.4

Computershare Inc.
480 Washington Boulevard
Jersey City, NJ 07310
Attn: Legal Department

    23.   <u>Miscellaneous</u>. This Amendment, together with the Lease, contains all the terms, covenants, conditions and agreements between Landlord and Tenant relating to the matters provided for in this instrument. No prior or other agreement or understanding pertaining to such matters shall be valid or of any force and effect. Each party to this Amendment shall execute all instruments and documents and take such further action as may be reasonably required to effectuate the purposes of this Amendment. This Amendment may be modified only by a writing executed by the parties hereto. This Amendment may be executed in multiple counterparts, each of which shall be deemed an original, and all such counterparts shall together constitute one and the same instrument. The invalidity of any portion of this Amendment shall not have any effect on the balance hereof. This Amendment shall be binding upon the parties hereto, as well as their successors, heirs, executors and assigns. This Amendment shall be governed by, and construed in accordance with, Kentucky law.

SIGNATURE PAGE ATTACHED HERETO

12

11843080V.4

IN WITNESS WHEREOF, the undersigned have executed the foregoing instrument the day and year first above written.

**LANDLORD:**

**DOF IV MEIDINGER TOWER, LLC,**
a Delaware limited liability company

By:
Name: Sam Chang
Title: Authorized Signatory

**TENANT:**

**COMPUTERSHARE INC.,**
a Delaware corporation

By:
Name: FRANK MADONNA
Title: EVP - Operations US /COO

11843080V.4

Exhibit A



7th Floor Core/Shell Plan

Note: Notwithstanding the above depiction, elevators, structural columns, elevator shafts, stairwells, mechanical rooms, and similar areas that are not generally open to tenant use are not part of the Seventh Floor Premises.

11843080V.4

Exhibit B



16th Floor Core/Shell Plan          1" = 20'-0"

Note: Notwithstanding the above depiction, elevators, structural columns, elevator shafts, stairwells, mechanical rooms, and similar areas that are not generally open to tenant use are not part of the Sixteenth Floor Premises.

11843080V.4

Exhibit C





## 5th Floor Core/Shell Plan

1" = 20'-0"

Note: Notwithstanding the above depiction, elevators, structural columns, elevator shafts, stairwells, mechanical rooms, and similar areas that are not generally open to tenant use are not part of the Fifth Floor Premises.

11843080V.4

<u>Exhibit D</u>

<u>Commencement Date Agreement</u>

This Commencement Date Agreement (this "**Agreement**") made this ____ day of _____, 20__, by and between DOF IV MEIDINGER TOWER, LLC, a Delaware limited liability company ("**Landlord**") and COMPUTERSHARE INC., a Delaware corporation ("**Tenant**").

WITNESSETH

WHEREAS, on _____ ___, 2016, Landlord and Tenant entered into a Third Amendment to Lease Agreement (the "**Amendment**") relating to the building and premises commonly known as Meidinger Tower and located at 462 South 4th Street, Louisville, Kentucky. Capitalized terms used herein without definition have the meaning specified within the Amendment.

WHEREAS, on _____, 2016, Tenant accepted delivery of the Seventh Floor Premises (as defined in the Amendment) and therefore, pursuant to Sections 2 and 3 of the Amendment, the Seventh Floor Expansion Commencement Date and the Expiration Date (each as defined in the Amendment) have now been determined; and

WHEREAS, the parties desire to confirm the Seventh Floor Expansion Commencement Date and the Expiration Date.

NOW THEREFORE, in consideration of the mutual covenants herein contained, Landlord and Tenant agree as follows:

(1)    The Seventh Floor Expansion Commencement Date is _____ ___, 20__.

(2)    The Expiration Date of the Lease is _____ ___, 2023.

(3)    The Lease is in full force and effect and is hereby ratified and confirmed.

[END OF DOCUMENT; SIGNATURES APPEAR ON THE FOLLOWING PAGE]

11843080V.4

Exhibit E

**Tenant Improvements**

(a)     Tenant, at its expense, shall be responsible for refurbishing, upgrading and/or remodeling the interior improvements within the Third Amendment Expansion Premises (the *"Tenant Improvements"*). Tenant's proposed architect/engineer and construction contractor are subject to Landlord's prior approval, which approval shall not be unreasonably withheld or delayed. Tenant shall, at its sole cost and expense, prepare and submit to Landlord a complete set of plans and specifications and construction drawings (collectively, the *"Plans and Specifications"*) covering all work to be performed by Tenant in constructing the Tenant Improvements. The Plans and Specifications shall be in such detail as Landlord may reasonably require and shall be in compliance with all applicable statutes, ordinances, rules and regulations. Landlord's approval of the Plans and Specifications shall not be deemed to be a warranty or representation that the Plans and Specifications comply with all applicable statutes, ordinances, rules and regulations. Landlord shall review the Plans and Specifications and indicate requested changes, if any, by written notice to Tenant, within fifteen (15) days after receipt of the Plans and Specifications by Landlord. If Landlord fails to indicate such requested changes to the Plans and Specifications by such date, the Plans and Specifications shall be deemed approved. Thereafter, any changes to the Plans and Specifications affecting the items listed above shall be subject to Landlord's written approval.   It is agreed that the construction costs for the Tenant Improvements shall include Landlord's construction management fee equal to two percent (2%) of the Tenant Improvements construction costs (hard costs only).   Such construction management fee shall not apply for any Tenant Improvements made by Tenant at Tenant's expense after Tenant's initial occupancy of all of the Third Amendment Expansion Premises.

(b)     Tenant and its contractor shall use reasonable speed and diligence to construct the Tenant Improvements in a good, first-class, workmanlike, lien-free and timely manner and in accordance with the Plans and Specifications. Tenant shall carry, or cause its contractor to carry, insurance reasonably satisfactory to Landlord and in all respects compliant with the requirements of the Lease throughout the construction of the Tenant Improvements.

(c)     Landlord shall reimburse Tenant and/or, in Landlord's sole discretion, pay directly for Tenant's third-party, out-of-pocket costs incurred in constructing the Tenant Improvements in the Third Amendment Expansion Premises up to $1,261,740.00 (the *"Tenant Improvement Allowance"*). Tenant shall be responsible for all costs of construction of the Tenant Improvements in excess of the Tenant Improvement Allowance. Provided that Tenant is not in default under the Lease, the Tenant Improvement Allowance shall be paid as follows:

(1)     Landlord shall pay the applicable portion of the Tenant Improvement Allowance to Tenant and/or, in Landlord's sole discretion, directly to the parties performing the work at such time that Tenant's contractor has:

(a)     substantially completed the Tenant Improvements with respect to the applicable portion of the Third Amendment Expansion Premises and, if

applicable, received a certificate of occupancy from the applicable governing authority;

(b)  delivered to Landlord lien waivers and affidavits from Tenant's contractor, all subcontractors, and all laborers or materials suppliers having performed any work at the applicable portion of the Third Amendment Expansion Premises relating to the Tenant Improvements, together with any other evidence reasonably required by Landlord to satisfy Landlord's title insurer that there are no parties entitled to file a lien against the real property underlying the Building in connection with such work; and

(c)  delivered to Landlord all invoices, receipts and other evidence reasonably required by Landlord to evidence the cost of the Tenant Improvements.

(2)  In the event Tenant has failed to substantially complete the Tenant Improvements on or before one hundred twenty days following the Fifth Floor Expansion Commencement Date, Tenant shall forfeit (and Landlord shall have no obligation to pay) any remaining undisbursed portion of the Tenant Improvement Allowance.

(3)  Provided that the conditions of sections (c)(1) and (c)(2) above have all been satisfied, any unused portion of the portion of the Tenant Improvement Allowance allocated to the associated portion of the Third Amendment Expansion Premises shall be applied as a credit against Tenant's Base Rent obligations beginning on the first (1st) day of the month immediately following the date of Tenant's satisfaction of the conditions of sections (c)(1) and (C)(2) above.

(4)  Landlord's payment of the Tenant Improvement Allowance shall not be deemed to be a warranty or representation that the Tenant Improvements have been constructed in accordance with the Plans and Specifications or applicable laws.

# FOURTH AMENDMENT TO LEASE AGREEMENT

THIS FOURTH AMENDMENT TO LEASE AGREEMENT (this "**Fourth Amendment**") is entered into this 14th day of December, 2017 (the "**Effective Date**"), by and between MEIDINGER BUILDING OWNER, LLC, a Delaware limited liability company ("**Landlord**") and COMPUTERSHARE INC., a Delaware corporation ("**Tenant**").

## RECITALS:

A.      Landlord (as successor-in-interest to DOF IV Meidinger Tower, LLC) and Tenant are parties to that certain Lease Agreement dated November 5, 2014, and amended by that certain First Amendment to Lease Agreement dated June 15, 2015, that certain Second Amendment to Lease Agreement dated September 29, 2015, and that certain Third Amendment to Lease Agreement dated October 18, 2016 (the "**Lease**").  Capitalized terms set out herein shall have the same meaning as set out in the Lease, unless otherwise defined herein.

B.      Pursuant to the Lease, Landlord has leased to Tenant space currently consisting of approximately 97,978 rentable square feet (the "**Existing Premises**"), consisting of the entire fifth, seventh, eighth, ninth, tenth, eleventh and sixteenth floors in that building commonly known as the Meidinger Tower located at 462 South 4th Street, Louisville, Kentucky (the "**Building**").

C.      Tenant desires to expand the Existing Premises by leasing the twenty-third floor of the Building (the "**Fourth Amendment Expansion Premises**"), consisting of 14,341 rentable square feet, as shown in **Exhibit A** attached hereto, on the terms and conditions set forth in this Fourth Amendment.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant agree as follows:

1.      Recitals: Defined Terms.  The foregoing Recitals are, by this reference, hereby incorporated herein as if the same had been fully set forth in this Fourth Amendment.   All capitalized terms used herein shall have the same meaning as in the Lease unless otherwise defined herein.

2.      Expansion of Premises to Include the Fourth Amendment Expansion Premises.

a.      Expansion of Premises; Delivery.  Commencing on the date on which Landlord delivers the Fourth Amendment Expansion Premises to Tenant in "as-is" condition (the "**Twenty-Third Floor Expansion Commencement Date**"), and continuing until the end of the Lease Term, and notwithstanding anything to the contrary contained in the Lease, the Premises shall be expanded to include the Fourth Amendment Expansion Premises. The Fourth Amendment Expansion Premises shall not include elevator shafts, structural columns, stairwells, mechanical rooms, and similar areas that are not generally

1

open to tenant use. From and after the Twenty-Third Floor Expansion Commencement Date and until the end of the Lease Term, any reference to the "Premises" in the Lease shall be deemed to refer to the Premises as expanded to include the Fourth Amendment Expansion Premises. After the Twenty-Third Floor Expansion Commencement Date, "Tenant's Share" shall be 33.93% for all purposes under the Lease. Landlord shall deliver the Fourth Amendment Expansion Premises to Tenant in "as-is" condition within five (5) business days of the current tenant returning possession of the Fourth Amendment Expansion Premises to Landlord. As used in this Agreement, "as-is" condition shall mean that the Fourth Amendment Expansion Premises shall be in compliance with the Legal Requirements, vacant, broom clean, and with all building systems in good working order

     b.    <u>Expansion of Premises Rent Commencement</u>. Rent for the Fourth Amendment Expansion Premises shall commence on the earlier of (i) one-hundred and twenty (120) days after the Twenty-Third Floor Expansion Commencement Date or (ii) Tenant's occupancy of the Fourth Amendment Expansion Premises for the conduct of its business (the "**Twenty-Third Floor Rent Commencement Date**"); provided however, in no event shall the Twenty-Third Floor Rent Commencement Date occur less than ninety (90) days after the Twenty-Third Floor Expansion Commencement Date. Tenant agrees to execute a Commencement Date Agreement in substantially similar form to the attached Exhibit B within five (5) days of receipt of such document confirming the Twenty-Third Floor Rent Commencement Date.

     c.    <u>Base Rent</u>. Effective as of the date hereof, Section 5.1 of the Lease is amended to add the following to the Base Rent chart set forth therein:

| Time Period | Fourth Amendment Expansion Premises Monthly Amount |
|---|---|
| First Lease Year | $11,950.83 |
| Second Lease Year | $12,249.60 |
| Third Lease Year | $12,555.84 |
| Fourth Lease Year | $12,869.74 |
| Fifth Lease Year | $13,191.48 |
| Sixth Lease Year | $13,521.27 |

A "Lease Year" shall be comprised of a period of twelve (12) consecutive months (except for the sixth Lease Year). The first Lease Year shall commence on the Twenty-Third Floor Rent Commencement Date but, notwithstanding the immediately preceding sentence, if the Twenty-Third Floor Rent Commencement Date is not the first day of a month, then the first Lease Year shall also include the additional period from the Twenty-Third Floor Rent Commencement Date to the end of the then-current month. Each succeeding Lease Year shall end on the anniversary date of the last day of the preceding Lease Year (except for the sixth Lease Year, which shall end on October 31, 2023). For example, if the Twenty-Third Floor Rent Commencement Date is April 1, 2018, then the first Lease Year would begin on April 1, 2018 and end on March 31, 2019, and each succeeding Lease Year would

2

begin on April 1 and end on March 31 (except for the sixth Lease Year, which would begin on April 1, 2023 and end on October 31, 2023). If, however, the Twenty-Third Floor Rent Commencement Date is April 2, 2018, then the first Lease Year would begin on April 2, 2018 and end on April 30, 2019, the second Lease Year would begin on May 1, 2019 and end on April 30, 2020, and each succeeding Lease Year would begin on May 1 and end on April 30 (except for the sixth Lease Year, which would begin on May 1, 2023 and end on October 31, 2023).

     d.    <u>Additional Rent</u>. Tenant's obligation to pay Tenant's Share of Operating Expenses and any Additional Rent with respect to the Fourth Amendment Expansion Premises shall begin on the Twenty-Third Floor Rent Commencement Date. Nothing contained herein shall affect Tenant's obligation with respect to Base Rent, Tenant's Share of Operating Expenses, or Additional Rent with respect to any portion of the Premises other than the Fourth Amendment Expansion Premises.

    3.    <u>Tenant Access for Preparation of the Fourth Amendment Expansion Premises</u>. Tenant shall have advance access to the applicable portion of the Fourth Amendment Expansion Premises (and such entry, alone, shall not constitute Tenant's taking possession of such portion of the Fourth Amendment Expansion Premises) for the purposes of preparing such portion of the Fourth Amendment Expansion Premises for Tenant's occupancy, which access shall be on all the terms and conditions of the Lease (including, obligations with respect to maintenance of insurance) except for the obligation of Tenant to pay Base Rent, Additional Rent and Tenant's Share of Operating Expenses and Tenant may only use such portion of the Fourth Amendment Expansion Premises for the use set forth herein during such period. Tenant acknowledges that no representations or warranties as to the condition or repair of the Fourth Amendment Expansion Premises have been made by Landlord and all such representations and warranties are expressly disclaimed (including, without limitation, implied representations and warranties), unless such are expressly set forth in this Fourth Amendment. Taking of possession of any portion of the Fourth Amendment Expansion Premises by Tenant for reasons beyond preparation of such portion of the Fourth Amendment Expansion Premises for Tenant's occupancy shall be deemed conclusively to establish that Landlord has delivered such portion of the Fourth Amendment Expansion Premises in accordance with its obligations under this Fourth Amendment and the Lease and that such portion of the Fourth Amendment Expansion Premises are in good and satisfactory condition, as of such date of possession.

    4.    <u>Staging Area</u>. Beginning on the earlier of the Twenty-Third Floor Expansion Commencement Date or the thirty-first (31st) day following the Effective Date and continuing through and including the one hundred eightieth (180th) day after the Twenty-Third Floor Expansion Commencement Date (such period, the "**Staging Term**"), Landlord shall allow Tenant to use Suite 1210 for Tenant's use as a staging area (the "**Staging Area**") for construction materials and equipment, furniture and other items necessary to Tenant's completion of the Tenant Improvements. Additionally, Landlord shall have the right to relocate the Staging Area or any portion thereof to a similarly sized area of Landlord's choosing and Tenant shall vacate and surrender the Staging Area, or designated portion thereof, to Landlord with thirty (30) days written notice to Tenant, provided that Landlord makes replacement space available to Tenant. The Staging Area shall be vacated by Tenant and surrendered to Landlord in broom clean condition

3

with any damage caused by Tenant's use repaired prior to the end of the Staging Term. Except as set forth in this Section 4, all terms and conditions of the Lease applicable to the Premises shall be applicable to the Staging Area except that Tenant shall only use the Staging Area as provided in this Section 4 and Tenant shall not be obligated to pay Base Rent, Additional Rent or Tenant's Share of Operating Expenses with respect to the Staging Area.

     5.     Tenant Improvement Allowance.  See Exhibit C attached hereto.

     6.     Exterior Signage. Tenant shall commence installation of exterior signage within one-hundred and eighty (180) days of execution of this Fourth Amendment.

     7.     Broker. Except for NAI Fortis Group ("**Landlord's Broker**") and Howard Ecker + Company ("**Tenant's Broker**"), Tenant represents and warrants that it has not had dealings with any real estate broker, finder or other person, with respect to this Fourth Amendment in any manner. Landlord shall pay such fees that are payable only to Landlord's Broker and Tenant's Broker pursuant to the terms and conditions of a separate agreement regarding such fees. Tenant shall indemnify and hold Landlord harmless from any and all damages resulting from any claims that may be asserted against Landlord by any other broker, finder or other person (including, without limitation, any substitute or replacement broker claiming to have been engaged by Tenant), claiming to have dealt with Tenant in connection with the negotiation and/or execution of this Fourth Amendment. The provisions of this article shall survive the expiration or termination of the Lease.

     8.     Binding Effect.  The amendments made to the Lease pursuant to this Fourth Amendment shall be binding upon the parties and their respective successors and assigns.

     9.     Nature of Amendments. Except as expressly modified in this Fourth Amendment, the Lease remains unchanged and in full force and effect.  To the extent there are any conflicts between the terms of this Fourth Amendment and the Lease, the terms of this Fourth Amendment shall govern.

     10.     Acknowledgements.  Landlord and Tenant each acknowledge that (i) to its knowledge, the other party to the Lease has complied with all of its obligations under the Lease to date, and (ii) to the extent not expressly modified hereby, all of the terms and conditions of said Lease shall remain unchanged, ratified and in full force and effect.

     11.     Notices.     Landlord and Tenant's addresses for notices and other communications set forth in Section 27.7 of the Lease are deleted and replaced as follows:

     Landlord:

Meidinger Building Owner, LLC
c/o In-Rel Properties North, LLC
2328 10th Avenue North, Suite 401
Lake Worth, FL 33461

with a copy to:

Meidinger building Owner, LLC
c/o NAI Fortis
Attn: Lenisa Alvey
462 S. 4th Street, Suite 400
Louisville, KY 40202

<u>Tenant</u>:

Computershare Inc.
1325 Remington Boulevard – Unit C
Bolingbrook, IL  60490
Attn:  Facilities Manager

with a copy to:

Computershare Inc.
480 Washington Boulevard
Jersey City, NJ  07310
Attn:  Legal Department

12.    <u>Non-Disturbance</u>.  Concurrently with the execution of this Fourth Amendment, Landlord will provide Tenant with an amendment to the Subordination, Non-Disturbance and Attornment Agreement, dated as of July 31, 2017 (the "SNDA"), pursuant to which Branch Banking and Trust Company (i) consents to this Fourth Amendment and (ii) agrees that from and after the date hereof the term "Lease" as used in the SNDA shall be deemed to mean the Lease as amended by this Fourth Amendment.

13.    <u>Miscellaneous</u>.  This Fourth Amendment, together with the Lease, contains all the terms, covenants, conditions and agreements between Landlord and Tenant relating to the matters provided for in this instrument.  No prior or other agreement or understanding pertaining to such matters shall be valid or of any force and effect.  Each party to this Fourth Amendment shall execute all instruments and documents and take such further action as may be reasonably required to effectuate the purposes of this Fourth Amendment.  This Fourth Amendment may be modified only by a writing executed by the parties hereto.  This Fourth Amendment may be executed in multiple counterparts, each of which shall be deemed an original, and all such counterparts shall together constitute one and the same instrument.  The invalidity of any portion of this Fourth Amendment shall not have any effect on the balance hereof.  This Fourth Amendment shall be binding upon the parties hereto, as well as their successors, heirs, executors and assigns.  This Fourth Amendment shall be governed by, and construed in accordance with, Kentucky law.

SIGNATURE PAGE ATTACHED HERETO

5

IN WITNESS WHEREOF, the undersigned have executed the foregoing instrument the day and year first above written.

**LANDLORD:**

**MEIDINGER BUILDING OWNER, LLC,**
a Delaware limited liability company

By: _____

Name: KIRK LYNH

Title: CEO

**TENANT:**

**COMPUTERSHARE INC.,**
a Delaware corporation

By: _____

Name: NICK OLDFIELD

Title: CFO

Exhibit A

Fourth Amendment Expansion Premises
23rd Floor



Exhibit B

Commencement Date Agreement

This Commencement Date Agreement (this "**Agreement**") made this _____ day of _____, 20__, by and between MEIDINGER BUILDING OWNER, LLC, a Delaware limited liability company ("**Landlord**") and COMPUTERSHARE INC., a Delaware corporation ("**Tenant**").

W I T N E S S E T H

WHEREAS, on _____ ___, 2017, Landlord and Tenant entered into a Fourth Amendment to Lease Agreement (the "**Fourth Amendment**") relating to the building and premises commonly known as Meidinger Tower and located at 462 South 4th Street, Louisville, Kentucky. Capitalized terms used herein without definition have the meaning specified within the Fourth Amendment.

WHEREAS, on _____, 2017, Tenant accepted delivery of the Fourth Amendment Expansion Premises (as defined in the Fourth Amendment) and therefore, pursuant to Section 2 of the Fourth Amendment, the Twenty-Third Floor Expansion Commencement Date and the Twenty-Third Floor Rent Commencement Date (each as defined in the Fourth Amendment) have now been determined; and

WHEREAS, the parties desire to confirm the Twenty-Third Floor Expansion Commencement Date and the Twenty-Third Floor Rent Commencement Date.

NOW THEREFORE, in consideration of the mutual covenants herein contained, Landlord and Tenant agree as follows:

(1)     The Twenty-Third Floor Expansion Commencement Date is _____ ___, 20__.

(2)     The Twenty-Third Floor Rent Commencement Date is _____, _____.

(3)     The Base Rent Schedule is modified as follows. [Insert table based on above dates]

(4)     The Lease is in full force and effect and is hereby ratified and confirmed.

[END OF DOCUMENT; SIGNATURES APPEAR ON THE FOLLOWING PAGE]

11843080V.4

IN WITNESS WHEREOF, Landlord and Tenant have caused this Agreement to be duly executed on the date first written above.

**LANDLORD:**

**MEIDINGER BUILDING OWNER, LLC,**
a Delaware limited liability company

By: _____
Name: _____
Title: _____

**TENANT:**

**COMPUTERSHARE INC.,**
a Delaware corporation

By: _____
Name: _____
Title: _____

11843080V.4

## Exhibit C

## **Tenant Improvements**

(a)     Tenant, at its expense, shall be responsible for refurbishing, upgrading and/or remodeling the interior improvements within the Fourth Amendment Expansion Premises and Tenant shall upgrade lighting, retrofit the HVAC, and upgrade bathrooms in a manner that is substantially similar to the work the Landlord performed on the other floors of the Premsies occupied by Tenant (the *"Tenant Improvements"*) within eighteen (18) months of the Effective Date. Tenant's proposed architect/engineer and construction contractor are subject to Landlord's prior approval, which approval shall not be unreasonably withheld or delayed. Tenant shall, at its sole cost and expense, prepare and submit to Landlord a complete set of plans and specifications and construction drawings (collectively, the *"Plans and Specifications"*) covering all work to be performed by Tenant in constructing the Tenant Improvements. The Plans and Specifications shall be in such detail as Landlord may reasonably require and shall be in compliance with all applicable statutes, ordinances, rules and regulations. Landlord's approval of the Plans and Specifications shall not be deemed to be a warranty or representation that the Plans and Specifications comply with all applicable statutes, ordinances, rules and regulations. Landlord shall review the Plans and Specifications and indicate requested changes, if any, by written notice to Tenant, within fifteen (15) days after receipt of the Plans and Specifications by Landlord. If Landlord fails to indicate such requested changes to the Plans and Specifications by such date, the Plans and Specifications shall be deemed approved. Thereafter, any changes to the Plans and Specifications affecting the items listed above shall be subject to Landlord's written approval. It is agreed that the construction costs for the Tenant Improvements shall include Landlord's construction management fee equal to two percent (2%) of the Tenant Improvements construction costs (hard costs only). Such construction management fee shall not apply for any Tenant Improvements made by Tenant at Tenant's expense after Tenant's initial occupancy of all of the Fourth Amendment Expansion Premises.

(b)     Tenant and its contractor shall use reasonable speed and diligence to construct the Tenant Improvements in a good, first-class, workmanlike, lien-free and timely manner and in accordance with the Plans and Specifications. Tenant shall carry, or cause its contractor to carry insurance reasonably satisfactory to Landlord and in all respects compliant with the requirements of the Lease throughout the construction of the Tenant Improvements.

(c)     Landlord shall reimburse Tenant and/or, in Landlord's sole discretion, pay directly for Tenant's third-party, out-of-pocket costs incurred in constructing the Tenant Improvements in the Fourth Amendment Expansion Premises up to $430,230.00 (the *"Tenant Improvement Allowance"*). Tenant shall be responsible for all costs of construction of the Tenant Improvements in excess of the Tenant Improvement Allowance. Provided that Tenant is not in default under the Lease, the Tenant Improvement Allowance shall be paid as follows:

(1)     Landlord shall pay the applicable portion of the Tenant Improvement Allowance to Tenant and/or, in Landlord's sole discretion, directly to the parties performing the work at such time that Tenant's contractor has:

(a)      substantially completed the Tenant Improvements with respect to the applicable portion of the Fourth Amendment Expansion Premises and, if applicable, received a certificate of occupancy from the applicable governing authority;

(b)      delivered to Landlord lien waivers and affidavits from Tenant's contractor, all subcontractors, and all laborers or materials suppliers having performed any work at the applicable portion of the Fourth Amendment Expansion Premises relating to the Tenant Improvements, together with any other evidence reasonably required by Landlord to satisfy Landlord's title insurer that there are no parties entitled to file a lien against the real property underlying the Building in connection with such work; and

(c)      delivered to Landlord all invoices, receipts and other evidence reasonably required by Landlord to evidence the cost of the Tenant Improvements.


(2)      Provided that the conditions of section (c)(1) above have all been satisfied, any unused portion of the Tenant Improvement Allowance allocated to the Fourth Amendment Expansion Premises shall be applied as a credit against Tenant's Base Rent obligations beginning on the first (1st) day of the month immediately following the date of Tenant's satisfaction of the conditions of section (c)(1) above.

(3)      Landlord's payment of the Tenant Improvement Allowance shall not be deemed to be Landlord's warranty or representation that the Tenant Improvements have been constructed in accordance with the Plans and Specifications or applicable laws.